# EXHIBIT A

Electronically Filed
5/2/2019 6:40 PM
Steven D. Grierson
CLERK OF THE COURT

1

GREGG A. HUBLEY, NBN 7386
**ARIAS SANGUINETTI WANG & TORRIJOS. LLP**
7201 W. Lake Mead Boulevard, Suite 570
Las Vegas. Nevada 89128
Telephone: (702) 789-7529
Facsimile: (702) 909-7865
E-mail: gregg@aswtlawyers.com

2

3

4

**CASE NO: A-19-794103-C**
**Department 1**

5

EUGENE FELDMAN, ESQ. (*pro hac vice pending*)
California Bar No. 118497
**ARIAS SANGUINETTI WANG & TORRIJOS, LLP**
6701 Center Drive West, 14th Floor
Los Angeles. CA 90045
Tel:      (310) 844-9696
Fax:      (310) 670-1231
E-mail: eugene@aswtlawyers.com

6

7

8

9

MARIANNE C. LANUTI. ESQ., NBN 7784
**LAW OFFICES OF MARIANNE C. LANUTI**
194 Inveraray Court
Henderson. Nevada 89074
Tel: (702) 501-1147
E-mail: NVKidsLaw@gmail.com

10

11

12

13

*Attorneys for Plaintiff*

14

## EIGHTH JUDICIAL DISTRICT COURT

15

## CLARK COUNTY, NEVADA

16

█████████████ JR., a minor by and
through his Parents, Joshua and Britten
Wahrer.

17

18

          Plaintiffs,

19

vs.

20

CLARK COUNTY SCHOOL DISTRICT;
PAT SKORKOWSKY, individually, and in his
official capacity as former Superintendent of
Clark County School District; MELODY
CARTER. individually and in her capacity as
Plaintiff's former teacher of record; DOES I-
X, and ROE CORPORATIONS I –X, inclusive

21

22

23

24

25

          Defendant(s).

26

27

28

Case No.:

Dept. No.:

**COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF**

Exempt from Arbitration
Amount in excess of $50,000.00 and
declaratory relief sought

Demand for Jury Trial

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, Plaintiff J.J., a minor by and through his natural parents, JOSHUA WAHRER and BRITTEN WAHRER (collectively, "Plaintiffs" and/or the "WAHRERS") by and through their attorneys, hereby complains and alleges as follows:

## I.    PARTIES

1.     Plaintiff J.J. ("Plaintiff" or "J.J") is, and at all times relevant hereto was, a resident of Clark County, Nevada.

2.     J.J. has been diagnosed with severe autism and was non-verbal at all times relevant to the allegations of this Complaint. J.J. was eligible for special education under the category of Autism Spectrum Disorder.

3.     Plaintiff JOSHUA WAHRER ("Josh") and Plaintiff BRITTEN WAHRER ("Britten") are and were at all times relevant hereto residents of Clark County, Nevada. Josh and Britten bring this action as the natural parents of J.J.

4.     Defendant CLARK COUNTY SCHOOL DISTRICT ("CCSD" or "Defendant") is, and at all times relevant hereto was, a division of the County of Clark, a Political Subdivision of the State of Nevada, and is not immune from suit under NRS 41.031.

5.     Defendant PAT SKORKOWSKY was the Superintendent of CCSD at the time the incidents alleged herein occurred. Defendant Skorkowsky was responsible for ensuring that students with disabilities within the CCSD are treated in compliance with the requirements of State and Federal laws.

6.     At the times relevant to the allegations in this Complaint, J.J. attended Harley Harmon Elementary School, a school within CCSD.

7.     Defendant MELODY CARTER ("Carter" or "Defendant") is and was at all times relevant hereto a resident of Clark County, Nevada.

8.     At times relevant to the allegations in this Complaint, Carter was J.J.'s Teacher of Record ("TOR").

9.     At all relevant times, Defendants DOES I-X were and are unknown to Plaintiff and are believed to be directors, employees or agents of Defendant CCSD who acted negligently,

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

carelessly, or recklessly in the control, management, and/or maintenance of school and teaching/educational operations described herein and any and all people who were involved in the incidents described below. The true names, identities or capacities, whether individual or otherwise, of Defendants DOES I-X are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes and therefore alleges that each of the Defendants sued herein as DOES I-X are responsible in some manner for the injuries to Plaintiff that DOE Defendants I-X contributed to the negligence of Defendant CCSD, and/or participated in the unlawful conduct against Plaintiff described herein. Moreover, DOE Defendants set policies and/or otherwise required employees and agents of CCSD to violate the law and cover-up the physical and mental abuse inflicted on Plaintiff by the Defendants. Their actions and/or omissions proximately caused injuries and damages to Plaintiff. When the true names and capacities of such Defendants become known, Plaintiff will ask leave of Court to amend this Complaint to insert the true names, identities, and capacities, together with proper charges and allegations.

10.     At all relevant times, Defendants ROE CORPORATIONS I-X were and are unknown to Plaintiff and are believed to be corporations, firms, partnerships, associations, or other entities involved in the operation, control, management, and/or maintenance of school and teaching/educational operations described herein and any and all entities who were involved in the incidents described below. The true names, identities or capacities, whether individual or otherwise, of Defendants DOES I-X are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes and therefore alleges that each of the Defendants sued herein as ROE CORPORATIONS are responsible in some manner for the injuries suffered by Plaintiff, in that ROE CORPORATIONS controlled CCSD, set policies for CCSD, and/or caused or contributed to the negligence of Defendant CCSD or others, as alleged herein, which thereby proximately caused the injuries and damages to the Plaintiff. When the true names and capacities of such Defendants become known, Plaintiff will seek leave of Court to amend this Complaint to insert the true names, identities, and capacities, together with proper charges and allegations.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

11.     At all times relevant herein, Defendants, and each of them, were the agents, servants, partners, and employees of each and every other Defendant, and were acting within the course and scope of the agency, partnerships, and employment, and, to the extent permitted by law, are jointly and severally liable.

## II.     JURISDICTION AND VENUE

12.     Plaintiff hereby adopts and incorporates by reference all prior paragraphs as though fully set forth herein.

13.     The actions and/or duties and obligations relevant to JJ's claims and the issues set forth in this action occurred and/or arose in Clark County, Nevada.  Thus, jurisdiction is proper in the Courts of this State and venue is proper in the Eighth Judicial District.

## III.     GENERAL FACTUAL ALLEGATIONS AND CAUSES OF ACTION

14.     Plaintiff hereby adopts and incorporates by reference all prior paragraphs as though fully set forth herein.

15.     J.J. is and was at all times material to the allegations of this Complaint entitled to receive full and equal access to a free and appropriate public education through the CCSD

16.     J.J., who is a six year old boy who suffers from severe Autism Spectrum Disorder, is a qualified individual with within the meaning of all applicable statutes, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42, U.S.C. § 12131 and NRS 613.310.

17.     During the 2016-2017 academic school year, numerous classroom teachers were assigned by CCSD to teach J.J.'s class at Harley Harmon Elementary School.

18.     During the 2017-2018 academic school year, Defendant Carter was assigned by CCSD to teach J.J.'s class at Harley Harmon School.

19.     Throughout J.J.'s time at Harley Harmon Elementary School, J.J. was the victim of severe neglect and abusive practices inflicted upon him, including, but not limited to, those described herein by different CCSD employees and/or personnel, all by and under the authority, direction or control of Defendant Skorkowsky, as former Superintendent of CCSD, and CCSD.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

20.     Defendant Carter and Defendant CCSD, under the authority, direction, and control of Defendant Skorkowsky, retaliated against J.J., using physical/corporal punishment against him and preparing and administering an Individualized Education Program ("IEP") that included negative reinforcement and other behaviors that were inconsistent with J.J.'s needs and that were, in fact, harmful to J.J.

21.     J.J.'s first TOR died in an automobile accident during early 2017.

22.     During the Spring semester of 2017, CCSD assigned numerous classroom teachers to J.J.'s class, as well as numerous teacher's aides, but none stayed very long.

23.     During the Spring semester of 2017, J.J.'s parents noticed that he was acting differently when he returned home.  J.J. became more irritable after being picked up from school and sometimes rushed to the refrigerator after arriving home in order to get food or drink.  J.J.'s parents packed his lunch, and it was often returned without having been opened during the day and with the same amount of water in his drinking cup than there was when he left for school.

24.     The IEP in place during the Spring semester of 2017 provided that CCSD employees would change J.J.'s diaper, when soiled/necessary, during the school day.  J.J.'s parents noticed during this semester that J.J.'s pants were regularly soiled through when he left school, sometimes resulting in severe skin discoloration, rashes, lacerations and abrasions in his crotch area.

25.     During the Spring semester of 2017, J.J. was often filthy dirty (in addition to wearing soiled diapers/pants) when he was picked up from school by his parents, and it was clear that he was not being educated in a safe or sanitary space.

26.     J.J.'s parents notified CCSD that J.J. was being denied the food and water sent with him to school, but the CCSD did nothing to investigate or rectify the situation.  J.J.'s parents had to resort to putting dye in J.J.'s water container to show that he was not being given any water throughout the day.

27.     J.J.'s parents notified CCSD employees during 2017 that J.J. was being denied food and water, and that he was often filthy and sitting in his own waste when he was picked up from school.  J.J.'s parents ultimately escalated their concerns to the Principal of Harley Harmon

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Elementary School, Shannon Schumm, who met with Plaintiffs in person, and actually laughed and scoffed at them, but who ultimately did nothing to address the issues.

28.     J.J.'s behavior drastically declined after the completion of the Spring, 2017, semester. J.J. became more aggressive and started routinely attempting to elope and/or escape from his classroom/school grounds.

29.     During a meeting at Harley Harmon Elementary School at the beginning of the Fall semester of 2017, J.J.'s parents were first introduced to Defendant Carter and were informed that Defendant Carter would be J.J.'s TOR for the year. During the introduction, Defendant Carter warned J.J.'s parents that they better not dare try to dye J.J.'s water under her watch, and insinuated that she knew how to deal parents who complained, like J.J.'s parents.

30.     J.J.'s parents started noticing unexplained bruising on J.J.'s body when he was picked up from school after the beginning of the Fall, 2017, semester. The bruising was often on and around his lower legs and even across his abdomen. J.J.'s parents notified Harley Harmon Elementary School of the bruising, but were told that J.J. had fallen and/or otherwise injured himself "on the playground."

31.     On May 2, 2018, a substitute teacher's aide employed by CCSD (hereinafter, NTS") was in the class room with J.J. and Defendant Carter, and observed Defendant Carter repeatedly strike J.J. with a pointer stick across his legs.

32.     On May 2, 2018, at approximately 9:30 a.m., Defendant Carter started screaming at J.J., instructing him to put his shoes on. Defendant Carter then grabbed a pointer stick and struck J.J. with it five times. Defendant Carter swung the pointer stick at J.J. with such force that it made noises when the pointer stick was cutting through air.

33.     On May 2, 2018, NTS observed Defendant Carter break the pointer stick over J.J.'s body and/or legs as she was striking him with the pointer stick.

34.     After breaking the pointer stick over J.J.'s body, Defendant Carter told him, "I have more of those," and threw the broken pointer stick in the garbage.

35.     J.J. was observed yelping and crying, and he appeared to feel pain when he was struck by Carter, but J.J. was unable to articulate or verbalize how he felt.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

36.     J.J. cowered into a fetal position and started to cover his legs with his hands when Defendant Carter grabbed the pointer stick on May 2, 2018.

37.     A witness (NTS) observed that, based upon J.J.'s reaction when Carter grabbed the pointer stick and approached him, it appeared to her that J.J. had been struck by Carter with the pointer stick before.

38.     Another teacher's aide was present in the room during the May 2, 2018, beating (hereinafter, "EL"), and was in fact sitting close to J.J. when Defendant Carter beat him with the pointer stick.

39.     EL did not report the abuse committed by Carter on May 2, 2018, to CCSD.

40.     EL stated that she heard "tapping noises" on May 2, 2018, and when she turned to look toward the noises she saw Defendant Carter "tapping" J.J. with the pointer stick.  EL was aware that the pointer stick broke when Defendant Carter was beating J.J. with it, and admitted that, to break the pointer stick, one would have to hit it hard against something.

41.     EL admitted that she had seen Carter strike J.J. with the pointer stick before May 2, 2018, but EL called it "tapping," like the May 2, 2018, incident, and EL never reported the abuse to CCSD.

42.     There were two (2) students in J.J.'s classroom on May 2, 2018, who were verbal. One of the students stated that she had seen Defendant Carter strike J.J. with pointer sticks in the past when "…he's being mean[,]" and "…because he was taking his shoes and socks off."  The student also stated that she saw Carter break the stick over J.J.'s body and that this made her feel sad.

43.     J.J. was evaluated by a nurse on May 3, 2018, who reported that J.J. had bruising around his leg, knee, and ankle that was consistent with having been beaten with a pointer stick.

44.     On June 8, 2018, a Criminal Complaint was filed with the Justice Court, Las Vegas Township, Clark County, Nevada, charging Carter with felony child abuse, neglect, or endangerment for the May 2, 2018, beating of J.J., a true and correct copy of which is attached hereto as **Exhibit "1,"** and is fully incorporated herein.

45.     Defendant Carter was terminated by CCSD as a result of the May 2, 2018, beating of J.J.

46.     Plaintiff is informed, and believes, and hereby alleges, that Carter had committed acts of corporal punishment and/or physical abuse against students and/or other persons, and that the CCSD was aware of her history in this respect.

47.     At the request of J.J.'s parents, J.J. was moved from Harley Harmon Elementary School to Ferron Elementary School, were he remains today

48.     J.J. has experienced severe and significant behavioral changes since the Spring, 2017, school year, including, but not limited to, the following:

   a.   J.J. stopped sleeping through the night.

   b.   J.J. stopped showing any enjoyment when going to school, and started having tantrums in the vehicle on the way to school/when getting out of the vehicle.

   c.   J.J. has become an almost constant elopement risk, and regularly attempts to run away from class and from school.

   d.   J.J. appears more anxious and jumpy around those with whom he is familiar.

   e.   J.J. has become violent toward the family dogs and his parents at times.

   f.   J.J. cowers when his parents elevate their voices or attempt to correct his behavior.

49.     In addition to the beating administered by Carter on May 2, 2018, and the beatings she administered to J.J. before May 2, 2018, J.J. has sustained other injuries, including a black eye that occurred at the school in which he is currently enrolled that CCSD failed to timely or properly report.

50.     On September 20, 2018, counsel for J.J. filed a Request for Impartial Due Process hearing pursuant to the Individuals with Disabilities Education Act in order to address the abuse and neglect that occurred during the 2017 Spring semester, to address the abuse that occurred during the 2017 Fall and 2018 Spring semesters, and to obtain remedies for the violations that occurred pursuant.

51.     On April 9, 2019, and April 10, 2019, the Due Process hearing went forward before an Independent Hearing Officer ("IHO") assigned by the CCSD.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

52.     On April 22, 2019, the IHO assigned by the CCSD served his "Decision," a true copy of which is attached hereto as **Exhibit "2,"**[1] and is fully incorporated herein.

53.     In order to avoid having to produce any witnesses at the Due Process hearing on April 9, 2019, and April 10, 2019, CCSD did not contest that Defendant Carter beat J.J. on May 2, 2018. In documents filed with the IHO, CCSD stated:

a.     "There is no further information or testimony needed to determine any of the issues presented in the Petitioner's due process complaint, because the District has conceded all of the issues presented for the hearing in this case."

b.     "[A]ny information related to the incident is [...] unnecessary because the District has conceded the facts and the issues of this case."

c.     "[T]he calling of Melody Carter is also unnecessary because the District has admitted to the facts and conceded all issues raised in the complaint."

d.     "[T]he District has filed a Notice of Concession of Issues stating that it will neither contest the four issues presented by the hearing officer nor will it dispute the facts stated in the due process complaint."

e.     "The District has already stated that the incident has occurred. There is no further need for any witness regarding the incident."

f.     "Any information contained in [Darrin Puana's] report would have to do with the May incident which the District has amitted occurred.

g.     "[N]either the testimony of Darrin Puana or Melody Carter is necessary for the determination of any of the issues in this case because the District has conceded all of the issues."

54.     Moreover, CCSD admitted to having violated J.J.'s rights to a free and appropriate public education and did not contest an award of compensatory education to J.J. for the neglect and abuses that he suffered for three semesters. In a document filed with the IHO that was titled "Statement of Concession of Issues," CCSD stated the following:

---

[1]     The Decision attached to **Exhibit "2"** is partially inaccurate insofar as J.J.'s counsel did not receive any electronic transmission of the Decision (contrary to the assertion that it was being delivered "...in both electronic and hard copy[,]") *See,* **Exhibit "2,"** at p. 15, ll. 10-12).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

"the [sic] District hereby concedes, does not contest and will not oppose the legal violations asserted in the Petition [...]

The District reserves the right to contest the Petitioner's assertion that certain remedies are required under the IDEA, including, but not limited to, the use of tracking and surveillance device [sic] to be attached to the Student, and the preservation of evidence, including video evidence which is not evidence [sic] in this due process hearing.

While the District does not contest an award of compensatory education, the District will provide evidence of the school calendar and attendance record of the Student to determine the appropriate amount."

55.     The CCSD called the principal of J.J.'s current school to provide testimony at the Due Process Hearing, and the principal testified and identified on the record – for the first time – an incident during which J.J. banged his head on the floor, but the principal admitted that the incident was never documented or reported to the parents, and the principal did not even see fit to have J.J. examined by the school nurse.

56.     The principal of J.J.'s current school testified during the Due Process Hearing that J.J. sustained an injury (black eye) on the school yard during recess during the 2018-2019 school year.  When J.J.'s parents requested video footage of the injury, the principal advised them that the cameras were not working at the time of the injury.  The principal testified at the Due Process Hearing that the cameras had not been in operation years before this incident occurred.

57.     During the Due Process Hearing, the IHO found that CCSD had stipulated to the following Findings of Fact:

1.  On July 18, 2016, J.J. was enrolled at CCSD with eligibility for special education services based upon Autism Spectrum Disorder.

2.  CCSD conducted an IEP on July 18, 2016.  Present Levels of Performance were noted and included social/emotional deficits.

3.  J.J.'s July 18, 2016, IEP did not document any elopement behavior.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

4.  On July 18, 2016, CCSD completed Supplementary Aids and Services which included a home/school communication system (setting home/school) and the use of positive behavioral strategies.

5.  J.J.'s May 17, 2017, IEP documented that J.J. was observed spending "…a great deal of time crying and screaming."

6.  CCSD failed to adequately train and supervise relevant personnel in the delivery of positive behavioral strategies during the 2016-2017 academic year.

7.  During the 2016-2017 academic school year, J.J. was educated at a CCSD school.  The school's principal had a duty to supervise staff associated with the education of J.J.

8.  During the 2016-2017 academic school year, J.J. was periodically deprived of water at school in violation of NRS Chapter 388.

9.  During the 2016-2017 academic school year, J.J. was periodically deprived of food at school in violation of NRS Chapter 388.

10. During the 2016-2017 academic school year, J.J.'s parents notified the CCSD Superintendent concerning issues with food and water.

11. The CCSD failed to take corrective action during the 2016-2017 academic year to address the concerns raised by Student's parents as to food and water.

12. During the 2017-2018 academic school year, Student was assigned to a new teacher of record.

13. During the 2017-2018 academic school year, the school's principal where J.J. attended school had a duty to supervise J.J.'s TOR.

14. During the 2017-2018 academic school year, Student's school principal/CCSD failed to ensure proper training of relevant staff in Applied Behavioral Analysis, Positive Behavioral Strategies, Proper Restraint Training and Compliance with NRS Chapter 388.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

15. During the 2017-2018 academic school year, J.J. was a victim of repeated corporal punishment by his TOR including, but not limited to, being beaten across the ankles, lower legs and stomach region.

16. On May 2, 2018, J.J.'s TOR beat J.J. with a wooden pointer stick with such force it caused the wooden stick to break in two. After the pointer broke, J.J.'s TOR was heard stating, "I have more of these."

17. On May 3, 2018, a full day after the beating, CCSD reported the beating to J.J.'s parents. J.J.'s principal (Shannon Schumm) signed an incomplete CCF 624 Form describing the event.

18. During the 2017-2018 academic school year, J.J. sustained injuries some of which were a result of corporal punishment, requiring examination by a CCSD school nurse. The April 30, 2018, injury was not reported to J.J.'s parents. They May 2, 2018, injury to J.J. resulting from corporal punishment was not reported to J.J.'s parents until the following day.

19. During the 2017-2018 academic school year, CCSD staff observed, but failed to report until the following day, the use of corporal punishment inflicted upon J.J. by J.J.'s TOR.

20. During the 2017-2018 academic school year, CCSD had a duty to adequately train and supervise relevant CCSD teachers and staff.

21. During the 2017-2018 academic school year, J.J. engaged in acts of elopement that were not documented or reported to J.J.'s parents.

22. CCSD is responsible to train all staff in completing the CCF 624 paperwork correctly and in compliance with NRS Chapter 388.

23. On May 3, 2018, CCSD contacted CCSD police to conduct an investigation. The broken pointer was not available for evidence due to the fact that the garbage was already placed in the dumpster the night before and picked up in the morning.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

24. On May 3, 2018, CCSD Police discovered three (3) wooden pointer sticks in J.J.'s TOR's room.

25. On May 3, 2018, a Child Protective Services investigator conducted an interview with a peer of J.J.'s TOR who witnessed the abuse by J.J.'s TOR. The witness said that J.J.'s TOR would routinely hit J.J. with the pointer stick "when J.J. was mean," or when J.J. removed his shoes/socks.

26. On June 7, 2018, a Criminal Complaint against J.J.'s TOR was issued pursuant to NRS 200.508.1B for the May 2, 2018, beating of J.J.

58.     During the Due Process Hearing, the IHO found that CCSD had stipulated to the following Conclusions of Law:

1. CCSD staff allowed J.J. to be subjected to interventions that were inconsistent with J.J.'s IEPs.

2. J.J.'s/his parents' right to meaningful participation in in J.J.'s 2016, 2017, and 2018 IEP processes was significantly impeded due to the failure of CCSD to report aversive interventions and interventions that were contrary to J.J.'s IEP.

3. CCSD used inappropriate interventions that were contrary to J.J.'s IEP and failed to report the use of these interventions to J.J.'s parents.

4. CCSD's failure to appropriately intervene resulted in a deprivation of J.J.'s educational benefits.

5. CCSD failed to place J.J. in the least restrictive environment, and this resulted in the denial of FAPE by CCSD.

6. CCSD failed to provide staff who were properly trained and supervised in appropriate behavioral interventions.

59.  .   Notwithstanding the concessions made by CCSD, and despite the fact that the CCSD conceded on the record during the Due Process Hearing that J.J. should receive AngelSense with GPS tracking (for elopement) as well as compensatory education, the IHO refused to award the Supplemental Aid and Service (AngelSense with GPS) and refused to award J.J. with any compensatory education. Consequently, J.J. remains in the same position as before,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

and his parents have no ability to track his elopement or monitor to confirm that he is actually being educated instead of being beaten by his teacher, and the CCSD has more reason to retaliate than ever.

60.     The action of inflicting corporal punishment on young, non-verbal children with disabilities has been followed and condoned by the Defendants, and each of them, and are practices which are still pursued and condoned by the Defendants.

61.     The beatings administered by Defendant Carter on J.J. served no legitimate educational or other purpose, but instead were inflected solely to punish and humiliate J.J., as a child with a disability.

62.     The sadistic and abusive punishment practices that were ignored or covered-up by the CCSD, in addition to the past use of threats of retaliation, has made J.J.'s parents fearful for his physical safety and emotional welfare.

63.     Plaintiff is informed and believes, and herein alleges, that the above-described pattern and practice of punishment methods used against J.J. by the CCSD are not appropriate to achieve educational goals, and instead result in lasting and irreparable damage to the child.

## FIRST CAUSE OF ACTION

### (Assault)

64.     Plaintiff hereby adopts and incorporates by reference all prior paragraphs as though fully set forth herein.

65.     By beating J.J. with a pointer stick, and taking other actions as set forth herein, including yelling, screaming, and approaching J.J. with a pointer stick raised in the air, CCSD and its employees caused J.J. to feel apprehension of harmful or offensive contact, which constituted assault.

66.     J.J. was observed cowering into a fetal position, and attempting to cover his legs, when Defendant Carter grabbed her pointer stick and approached him with it on May 2, 2018.

67.     By repeatedly beating J.J., CCSD and its employees have caused and continue to cause J.J. to feel apprehension of imminent harmful or offensive contact, which constitutes repeated assaults.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

68.     As a direct and proximate result of the intentional acts of CCSD and its employees, J.J. sustained physical, mental, and emotional injuries due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, thus causing J.J. to suffer from sever terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

69.     Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment. Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

70.     As a direct and proximate cause of the intentional acts of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future. Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

71.     As a further proximate result of Defendant's intentional acts, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## SECOND CAUSE OF ACTION

### (Battery)

72.     Plaintiff hereby adopts and incorporates by reference all prior paragraphs as it fully set forth herein.

73.     By unnecessarily, and without any legitimate educational purpose, striking J.J. with a pointer stick, CCSD and its employees made an intentional, unlawful, and harmful contact with J.J.'s body, which constitutes a battery.

74.     Defendant Carter's unlawful assault and battery of J.J. was reasonably foreseeable to CCSD under the circumstances, considering the nature and scope of her employment.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

Moreover, Carter's conduct on May 2, 2018, was not a truly independent venture, but retaliatory treatment by Carter and CCSD for the prior complaints and issues with J.J.'s parents.

75.     As a result of the battery committed by CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

76.     Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment. Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

77.     As a direct and proximate cause of the intentional acts of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future. Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

78.     As a further proximate result of Defendant's intentional acts, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## THIRD CAUSE OF ACTION

### (Negligence)

79.     Plaintiff hereby adopts and incorporates by reference all prior paragraphs as it fully set forth herein

80.     Chapter 391 of the Nevada Administrative Code, Chapters 385, 388, 391, and 432B of the Nevada Revised Statutes, and the common law of the State of Nevada, impose a duty

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

of reasonable professional judgment and reasonable care upon CCSD and its employees in carrying out their responsibilities.

81.     NRS 392.465(3) defines corporal punishment as the "intentional infliction of physical pain or the physical restraint of a pupil for disciplinary purposes."

82.     NRS 392.465(1) prohibits the use of corporal punishment upon a pupil in any public school.

83.     NRS 392.465(1) is intended to protect students with disabilities from the type of injury, abuse, and intimidation that was suffered by J.J.

84.     CCSD and its employees committed negligence *per se* by inflicting corporal punishment upon J.J. repeatedly during the 2017-2018 academic school year.

85.     CCSD and its employees breached their duty of care that was owed to J.J. by repeatedly and without any justification (a) depriving him of food and water, (b) depriving him of cleanliness by refusing to change his diapers, (c) beating him and using corporal punishment on him, and (d) implementing and administering a IEP that was inconsistent with and inappropriate for J.J.'s educational needs.

86.     As a direct and proximate result of the negligence of CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

87.     Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment.  Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

88.     As a direct and proximate cause of the negligence of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and will continue to endure such losses for an indefinite period of time in the future.  Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

89.     As a further proximate result of Defendant's negligence, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## FOURTH CAUSE OF ACTION

### (Negligent Hiring, Training and Supervision)

90.     Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

91.     Chapter 391 of the Nevada Administrative Code, Chapters 385, 388, 391, and 432B of the Nevada Revised Statutes, and the common law of the State of Nevada, impose a duty of reasonable professional judgment and reasonable care upon CCSD and its employees in carrying out their responsibilities pursuant to Nevada State law.

92.     CCSD has a duty to properly hire, train, and supervise each of its employees, staff, and/or other agents, including Defendant Carter and any other TOR and/or aide working for or under the direction of CCSD who interacted with J.J. at Harley Harmon Elementary School during the times relevant to the allegations herein.

93.     CCSD's failure to properly hire, train and supervise each of its employees, staff, and/or other agents resulted in (a) denial of food and water to J.J., (b) depriving J.J. of cleanliness by refusing to change his diapers, (c) the use of corporal punishment on J.J., and (d) the administration of an IEP that was inconsistent with and inappropriate for J.J.'s educational needs.

94.     CCSD breached its duties to J.J. by negligently hiring an employee who repeatedly struck J.J., a non-verbal five (5) year old child at the time, with a pointer stick, and who was observed beating J.J. on May 2, 2018, and breaking the stick over J.J.'s body because J.J. removed his shoes.

ARIAS SANGUINETTI WANG & TORRIJOS. LLP

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARLAS SANGUINETTI WANG & TORRIJOS. LLP

95.     CCSD knew or should have known that Defendant Carter was violently inclined, was careless, and was prone to use corporal punishment, likely to lead to injuries to a student, and used negative reinforcement that was inconsistent with a student's IEP.

96.     CCSD breached its duties to J.J. by negligently hiring an employee (EL) who admittedly witnessed Carter striking J.J. with a pointer stick during the 2017/2018 academic school year, but who failed to document or report this to the police, J.J.'s parents, CCSD superiors, and/or anyone else.

97.     CCSD breached its duties to J.J. by negligently hiring an employee as a principal of an elementary school (Shannon Schumm) who failed to reasonably monitor or supervise her staff, failed to properly document aversive interventions, and failed to prepare and/or administer an appropriate IEP to J.J.

98.     CCSD breached its duties to J.J. by negligently failing to properly train its employees in the use of aversive interventions, the need to properly document and report aversive interventions, and in relation to the State prohibition against the use of corporal punishment on a student, particularly a vulnerable child who suffers from severe autism and is unable to communicate.

99.     CCSD breached its duties to J.J. by negligently supervising employees like Carter who used improper aversive interventions and corporal punishment against J.J.

100.    As a direct and proximate result of the negligent hiring, training, and supervision practices of CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

101.    Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment.  Leave to amend this Complaint is

requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

102.    As a direct and proximate cause of the negligent hiring, training, and supervision of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future. Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

103.    As a further proximate result of Defendant's negligent hiring, training, and supervision, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## FIFTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

104.    Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

105.    Nevada law entitles a plaintiff to damages for intentional infliction of emotional distress if the plaintiff establishes (a) that the defendant used extreme and outrageous conduct with the intention of, or a reckless disregard for, causing emotional distress, (b) that the plaintiff actually suffered severe or extreme emotional distress, and (c) that the extreme conduct used by defendant actually or proximately caused the emotional distress.

106.    As set forth above, during the relevant time period, CCSD and its employees (a) denied food and water to J.J., (b) deprived J.J. of a sanitary environment by refusing to change his diapers, (c) used corporal punishment on J.J., and (d) implemented and administered an IEP that was inconsistent with and inappropriate for J.J.'s educational needs.

107.    An assault and battery, by itself, is an example of extremely outrageous conduct. Deprivation of food and water, forcing a child to sit for extended periods in his/her own excrement, and administering an IEP for J.J. that explicitly called for negative reinforcement and punitive measures, when this was inconsistent to his needs and inappropriate, would likewise constitute extreme and outrageous conduct.

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

108.   The CCSD and its employees intended to cause J.J. emotional distress by using the conduct described herein, or acted with a reckless disregard for the potential that their conduct would cause J.J. emotional distress.

109.   As a direct and proximate result of the intentional acts of CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

110.   Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment.  Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

111.   As a direct and proximate cause of the intentional acts of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future.  Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

112.   As a further proximate result of Defendant's negligence, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## SIXTH CAUSE OF ACTION

### (VIOLATION OF CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS)

113.   Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

114.   By their actions as described herein, the Defendants, under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiff to the deprivation of rights,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  privileges, or immunities secured by the Constitution of the State of Nevada and the Constitution

2  of the United States of America, as well as laws of the State and Federal government. In

3  particular, as a student in a public school, J.J. has a liberty interest in personal security and

4  freedom from infliction of pain, as well as freedom from the deprivation of life-sustaining

5  necessities such as food and water.

6       115.   As set forth above, during the relevant time period, CCSD and its employees (a)

7  denied food and water to J.J., (b) deprived J.J. of a sanitary environment by refusing to change

8  his diapers, (c) used corporal punishment on J.J., and (d) implemented and administered an IEP

9  that was inconsistent with and inappropriate for J.J.'s educational needs.

10       116.   The forms of abuse and negligence that were committed by the CCSD against J.J.,

11  as described herein, were not inflicted on children without disabilities who were also attending a

12  public school in Clark County, Nevada.

13       117.   CCSD used the improper and unlawful practices described herein on J.J. in part

14  in an attempt to punish him or his parents because his parents were deemed to be 'complainers'

15  by the CCSD and its staff. The actions of J.J.'s parents, for which J.J. was being punished, were

16  a characteristic of J.J.'s disability and occurred because of his disability.

17       118.   CCSD used the improper and unlawful practices described herein on J.J. in part

18  in an attempt to punish him for his disability and for his actions, such as, taking his shoes off, his

19  inability to express what he needs, his inability to stay on task and/or cut his food, and his inability

20  to be fully 'potty trained.' J.J.'s actions, for which he was being punished, were all characteristics

21  of his disabilities and occurred because of his disability.

22       119.   The actions of Defendants, as described above, including, but not limited to, the

23  repeated use of corporal punishment and the repeated failure to report or document the uses of

24  corporal punishment, violated State law and CCSD's own written policies.

25       120.   The actions taken, or not taken, in response to the issues in which food, water, and

26  sanitary conditions were denied J.J., and in response to Defendant Carter's conduct, by Defendant

27  Skowkowsky and CCSD amounted to the adoption of the practices, customs, or policies being

28

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

used by J.J.'s teachers during Spring, 2017, and the practices, customs, or policies being used by Carter during the 2017-2018 academic school year.

121.    CCSD knew, or should have known, about the intentional and abusive practices being used by employees against J.J. and other students, which are so well-known as to constitute a custom or usage at Harley Harmon Elementary School as well as other schools within the CCSD.   Nonetheless, the CCSD failed to take affirmative action to provide for the safety and well-being of J.J. and the students in his class.

122.    As a direct and proximate result of the intentional and negligent acts of CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

123.    Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment.   Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

124.    As a direct and proximate cause of the intentional and negligent acts of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future.   Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

125.    CCSD's actions, and that of its employees, were malicious, deliberate, intentional, oppressive, and wanton, and were embarked upon with the knowledge of, or in conscious disregard to, the harm that would be inflicted on J.J.   As a result of said intentional conduct, J.J. is entitled to an award of exemplary/punitive damages to punish Defendants and to deter others from similar conduct.

126.   Defendants, and each of them, have, acting under the color of State law, deprived J.J. of rights, privileges, or immunities secured to him by the Constitution of the State of Nevada, Article 1, § 2 and §9, the Constitution of the United States of America, and 42 U.S.C. § 1983.

127.   As a further proximate result of Defendant's negligence, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## SEVENTH CAUSE OF ACTION

## (VIOLATION OF CONSTITUTIONAL RIGHT TO EQUAL PROTECTION)

128.   Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

129.   The actions of Defendants, as set forth herein, violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and Article I, § 9 of the Constitution of the State of Nevada, in that such actions are not inflicted upon other students in the CCSD who do not suffer from disabilities.

130.   As set forth above, during the relevant time period, CCSD and its employees (a) denied food and water to J.J., (b) deprived J.J. of a sanitary environment by refusing to change his diapers, (c) used corporal punishment on J.J., and (d) implemented and administered an IEP that was inconsistent with and inappropriate for J.J.'s educational needs.

131.   The forms of abuse and negligence that were committed by the CCSD against J.J., as described herein, were not inflicted on children without disabilities who were also attending a public school in Clark County, Nevada, constituting a violation of equal protection.

132.   As a direct and proximate result of the intentional and negligent acts of CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

133.    Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment.  Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

134.    As a direct and proximate cause of the intentional and negligent acts of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future.  Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

135.    CCSD's actions, and that of its employees, were malicious, deliberate, intentional, oppressive, and wanton, and were embarked upon with the knowledge of, or in conscious disregard to, the harm that would be inflicted on J.J.  As a result of said intentional conduct, J.J. is entitled to an award of exemplary/punitive damages to punish Defendants and to deter others from similar conduct.

136.    Defendants, and each of them, have, acting under the color of State law, deprived J.J. of rights, privileges, or immunities secured to him by Article I, § 9 of the Constitution of the State of Nevada, the Constitution of the United States of America, and 42 U.S.C. § 1983.

137.    As a further proximate result of Defendant's negligence, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter.

## EIGHTH CAUSE OF ACTION

### (VIOLATION OF CONSTITUTIONAL PROTECTIONS FOR DISABLED PERSONS)

138.    Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

139.    J.J. is a disabled person as defined in NRS 426.068

140.    Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, the regulations promulgated thereunder, and 28 C.F.R. Part 35, governing state and local governmental entities, protects

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

persons from discrimination on the basis of disability by public entities like CCSD. The ADA prohibits the exclusion from participation in, or being denied the benefits of the services, programs, or activities of the public entity, or being subjected to discrimination by such entity.

141.   Article I, § 9 of the Constitution of the State of Nevada and Nevada statute likewise protects persons from discrimination on the basis of disability by public entities like CCSD. Nevada law prohibits the exclusion from participation in, or being denied the benefits of the services, programs, or activities of the public entity, or being subjected to discrimination by such entity.

142.   Pursuant to 42 U.S.C. § 12203(a), it is unlawful to discriminate against any individual because that individual, and/or his or her designated guardian(s)/natural parent(s), has opposed any act or practice made unlawful by Chapter 42 of the United States Code.

143.   Pursuant to NRS 388.511, it is unlawful for an officer, administrator, or employee of a public school to retaliate against any person for having reported an act of aversive intervention, an act of corporal punishment, an act of aversive intervention, and/or an act of verbal and mental abuse committed by CCSD against a disabled child.

144.   Pursuant to 42 U.S.C. § 12203(b), it is unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of any rights granted under Chapter 42 of the United States Code.

145.   As set forth above, during the relevant time period, CCSD and its employees (a) denied food and water to J.J., (b) deprived J.J. of a sanitary environment by refusing to change his diapers, (c) used corporal punishment on J.J., and (d) implemented and administered an IEP that was inconsistent with and inappropriate for J.J.'s educational needs. In light of the factual background, these actions would be deemed unlawful and/or retaliatory under Chapter 42 of the United States Code and Chapter 388 of the Nevada Revised Statutes.

146.   The forms of abuse and negligence that were committed by the CCSD against J.J., as described herein, were not inflicted on children without disabilities who were also attending

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

a public school in Clark County, Nevada, and this violates the prohibition against discrimination based solely on the basis of a disability.

147.   Defendants, and each of them, have violated J.J.'s rights under the ADA and the regulations promulgated thereunder by committing the outrageous intentional and retaliatory acts and other acts of negligence described herein, denying J.J. the benefits of the services, programs, and activities to which he is otherwise entitled from the CCSD.

148.   As a direct and proximate result of the intentional and negligent acts of CCSD and its employees, J.J. sustained physical, mental and emotional injuries, and, due to the unprovoked and disproportionate attacks on his person by Carter and/or other CCSD employees, J.J. suffered from severe terror, pain and suffering, and severe mental anguish, some of which may be permanent in nature, all to his general and compensatory damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

149.   Plaintiff was required to incur expenses for medical and psychological/psychiatric care in an amount unknown at this time, and will be required to incur expenses in the future for medical and psychological/psychiatric care and treatment. Leave to amend this Complaint is requested so that this amount can be introduced so as to conform to proof at time of trial, and these special damages will be in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

150.   As a direct and proximate cause of the intentional and negligent acts of CCSD and its employees, Plaintiff endures pain and suffering, anxiety, emotional distress, and loss of enjoyment of life, and will continue to endure such losses for an indefinite period of time in the future. Leave to amend this Complaint is requested, so that this amount can be introduced so as to conform to proof at time of trial.

151.   As a further proximate result of Defendant's negligence, Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter pursuant to 42 U.S.C. §12133.

///

///

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### NINTH CAUSE OF ACTION

### (ABUSE OF A VULNERABLE PERSON/ENHANCED DAMAGES)

152.   Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

153.   At all times relevant to the allegations of this Complaint, J.J. was a "vulnerable person," according to Nevada law, in that he suffers from severe Autism Spectrum Disorder, a physical or mental impairment that substantially limits one or more of the major life activities or the person, and he has a medical or psychological record of the impairment.   NRS 41.1395(1)(e).

154.   Because of the critical need to protect vulnerable persons from abuse and exploitation, the Nevada legislature has enacted a law that provides that if a vulnerable person suffers a personal injury or death that is caused by abuse or neglect, the person who caused the injury, death or less is liable to the vulnerable person for two times the actual damages incurred by the vulnerable person.

155.   Carter committed an act of abuse against J.J., a vulnerable person, on May 2, 2018, when she struck him repeatedly with a pointer stick, which caused J.J. pain, physical injury and severe mental anguish.

156.   CCSD employees, including the TOR's who were assigned to J.J.'s class during the Spring semester of 2017 (whose identities are currently unknown, and who are named herein as DOE Defendants), committed acts of abuse against J.J., a vulnerable person, by depriving him of food, shelter, clothing or services which are necessary to maintain J.J.'s physical or mental health.

157.   Carter acted with recklessness, oppression, fraud, and/or malice, in the acts of abuse she committed against J.J., and, pursuant to NRS 41.1395(2), the Court should Order her to pay all of the attorney's fees and costs incurred by J.J. in this proceeding.

158.   The CCSD employees, including the TOR's who were assigned to J.J.'s class during the Spring semester of 2017 (whose identities are currently unknown, and who are named herein as DOE Defendants) acted with recklessness, oppression, fraud, and/or malice, in the acts

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

of abuse they committed against J.J., and, pursuant to NRS 41.1395(2), this Court should Order these additional employees to pay all of the attorney's fees and costs incurred by J.J. in this proceeding.

159. This Court should enter an award of enhanced damages to J.J. pursuant to NRS 41.1395(1) against Defendant Carter.

160. This Court should enter an award of enhanced damages to J.J. pursuant to NRS 41.1395(1) against the CCSD employees, including the TOR's who were assigned to J.J.'s class during the Spring semester of 2017 (whose identities are currently unknown, and who are named herein as DOE Defendants).

## TENTH CAUSE OF ACTION
## (PRELIMINARY INJUNCTIVE RELIEF)

161. Plaintiff hereby adopts and incorporates by reference all prior paragraphs as if fully set forth herein.

162. J.J. continues to attend Ferron Elementary School, which is within the CCSD, and, since May 2, 2018, he has repeatedly had his health and well-being endangered by the unlawful practices of the CCSD, which started with retaliatory treatment and now continues with acts of gross neglect. The principal of Ferron Elementary School recently testified under oath that she observed J.J. banging his head on the floor, that she had to physically restrain him from continuing to do this, and that she failed or refused to report or document the incident, inform J.J.'s parents, or even request a medical evaluation by the school nurse.

163. The principal of Ferron Elementary School recently testified that J.J.'s current IEP, which remains in effect as of this date, contains improper and inappropriate negative reinforcement.

164. J.J. continues to elope from his class room and the measures enacted by the principal at Ferron Elementary School to document and prevent this have been unsuccessful.

165. J.J. has a reasonable probability of success on the merits of the complaint, for which compensatory damages will not fully compensate J.J. for the continued harm he would face at the hands of CCSD employees, overtly or by omission, without the action of the Court.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

166. J.J. has no adequate remedy at law due to the threat which he continues to face.

167. J.J. is entitled to a preliminary injunction forbidding any CCSD employees from taking any further retaliatory action toward him.

168. J.J. is further entitled to a preliminary injunction mandating that the CCSD develop and administer an IEP for J.J. that removes the negative reinforcement measures, which are inappropriate for J.J. and harmful to him, and replace this with an appropriate IEP that is designed to address his needs as a student with severe Autism Spectrum Disorder and enable him to flourish in the educational setting.

169. Plaintiff was forced to retain the services of attorneys in this matter and should be awarded all attorney's fees and costs incurred in this matter pursuant to 42 U.S.C. §12133.

## IV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for Judgment against Defendants, and each of them, as follows:

1. For general damages in excess of Fifteen Thousand dollars ($15,000.00), according to proof upon trial;

2. For special damages in excess of Fifteen Thousand dollars ($15,000.00), according to proof upon trial;

3. For reasonable attorneys' fees incurred herein;

4. For Plaintiff's costs and disbursements of this suit;

5. For an award of enhanced damages against Defendant Carter and the CCSD employees, including the TOR's who were assigned to J.J.'s class during the Spring semester of 2017 (whose identities are currently unknown, and who are named herein as DOE Defendants), pursuant to NRS 41.1395(1);

6. For an award of punitive/exemplary damages, as Defendants acted oppressively and maliciously in repeatedly violating J.J.'s rights by depriving him of food, water, and necessary services, repeatedly committing acts of corporal punishment against him, and preparing, implementing and administering an IEP that was inappropriate for J.J.;

7. For an award of punitive/exemplary damages, as Defendants acted oppressively

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

ARIAS SANGUINETTI WANG & TORRIJOS, LLP

and maliciously in retaliating against J.J. as a result of his parents' repeated but fruitless attempts to ensure that his rights were being protected;

8.     For preliminary injunctive relief that prevents any CCSD employees from taking any further retaliatory action toward J.J., and mandating that the CCSD develop and administer an IEP for J.J. that removes the negative reinforcement measures, which are inappropriate for J.J. and harmful to him, and replace this with an appropriate IEP that is designed to address his needs as a student with severe Autism Spectrum Disorder and enable him to flourish in the educational setting.

9.     For such and further relief as this Court may deem just and equitable.

## V.     DEMAND FOR JURY TRIAL

Plaintiff herein demands a trial by jury on all issues so triable.

Dated this ____ day of May, 2019.

ARIAS SANGUINETTI WANG &
TORRIJOS, LLP

By: _____
GREGG A. HUBLEY, ESQ.
7201 W. Lake Mead Boulevard, Suite 570
Las Vegas, Nevada 89128
Tel: (702) 789-7529

EUGENE FELDMAN, ESQ. (*pro hac vice pending*)
California Bar No. 118497
**ARIAS SANGUINETTI WANG &
TORRIJOS, LLP**
6701 Center Drive West, 14th Floor
Los Angeles, CA 90045
Tel:     (310) 844-9696

MARIANNE C. LANUTI, ESQ., NBN 7784
**LAW OFFICES OF MARIANNE C.
LANUTI**
194 Inveraray Court
Henderson, Nevada 89074
Tel: (702) 501-1147

*Attorneys for Plaintiff*

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

# EXHIBIT 1

# EXHIBIT 1

1

JUSTICE COURT, LAS VEGAS TOWNSHIP
CLARK COUNTY, NEVADA

2

3    THE STATE OF NEVADA,

4            Plaintiff,          2018 JUN 8 AM 11: 23   CASE NO:   18F08965X

5        -vs-

6    MELODY JEAN TAPPIN CARTER, aka,        DEPT NO:   11
     Melody Jean Carter #0814067,

7

8            Defendant.                     CRIMINAL COMPLAINT

9        The Defendant above named having committed the crime of CHILD ABUSE,

10   NEGLECT, OR ENDANGERMENT (Category B Felony - NRS 200.508.1 - NOC 55226), in

11   the manner following, to wit: That the said Defendant, on or about the 2nd day of May, 2018,

12   at and within the County of Clark, State of Nevada, did willfully, unlawfully, and feloniously

13   cause a child under the age of 18 years, to wit: J.W., being approximately 5 year(s) of age, to

14   suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect, to wit:

15   physical injury of a nonaccidental nature, and/or cause J.W. to be placed in a situation where

16   he or she might have suffered unjustifiable physical pain or mental suffering as a result of

17   abuse or neglect, to wit: physical injury of a nonaccidental nature, by hitting and/or striking

18   J.W. about the leg(s) and/or ankle(s) and/or feet with a wooden stick with rubber hand and/or

19   "pointer."

20       All of which is contrary to the form, force and effect of Statutes in such cases made and

21   provided and against the peace and dignity of the State of Nevada.  Said Complainant makes

22   this declaration subject to the penalty of perjury.

23

24                                   _Bruce Wee_
                                     _____
25                                   06/07/18

26                                   18F08965X
                                     CRM
27   18F08965X/jw                    Criminal Complaint
     CCSDPD EV# 180503572            9531894
28   (TK11)

                                     W:\2018\2018F\08965\18F08965-COMP-001.DOCX

# CLARK COUNTY SCHOOL DISTRICT
# POLICE DEPARTMENT

18F08986X
DWS
Declaration of Warrant Summons (Affidavit)
9531886

# A F F I D A V I T
# (N.R.S. 171.106)

2018 MAY -8  A 11: 23

DR # 1805-03572

STATE OF NEVADA)

SS: Melody Jean Tappin Carter

COUNTY OF CLARK)

Detective R. Vance P#541, being first duly sworn, deposes and says;

That he is a peace officer with the Clark County School District Police Department, being so employed for the period of 5 YEARS/6 MONTHS assigned to investigate crimes against the State of Nevada not to exclude: **Child Abuse** committed on or about **May 2, 2018** which investigation has developed **Melody Carter** as the perpetrator thereof.

That affiant developed the following facts in the course of the investigation of said crime, to wit:

1. On 05/03/18, I (Detective R. Vance P#541) conducted a follow up investigation in regards to Child Abuse committed by a CCSD Teacher (Melody Carter) to a student (████████ ████ DOB ████████ which occurred on 05/02/18 at approximately 0930 hours at ████████, located at ████████████████████████.

2. Det. G. Hibner P#243 and I arrived at the school and were briefed by CCSDPD Officer Dakake P#542 who advised there was a witness (Nadine Torres-Sosa) who reported that she saw Carter strike ████████ with a stick in his lower legs. Officer Dakake advised there were visible bruises on ████████ ankles. He advised ████████ was in the Nurse's Office.

3. ████████████ is a five year old special needs, autistic non-verbal student.

4. I contacted Karen Stratford, who is the School Nurse. She advised she checked ████████ legs for injuries and saw a small dime sized round brown bruise on the outer aspect of the left leg just above the ankle joint. There is also an irregular shaped quarter size brown bruise on the inner aspect of the left ankle on the ankle bone. There is a small bruise on the right knee and a scabbed scratch on his right shin. ████████ was seen in the Nurse's Office on 04/30/18 after he fell on the playground and treated for the scratch on his shin. Stratford completed a signed statement which was attached to Officer Dakake's original report.

5. I checked ████████ injuries and located a bruise on his left outer ankle above the ankle bone that measured about .5 inches by .5 inches. On his left inner ankle I located a bruise about 1 inch by .75 inches, which was oval in shape consistent with being hit with a dowel or similar object. There was a bruise above his right knee that was about .5 inches by .5 inches.

SPD–R131.1 (Rev. 04–15)

CCSDPD
AFFIDAVIT (N.R.S. 171.106)
Page 2 of 4



6. Child Protective Services Investigator Yvette Gonzales, who was also conducting an investigation in to the alleged child abuse, contacted ▓▓▓▓ mother, identified as ▓▓▓▓ ▓▓▓▓ and gained consent to conduct a full body inspection of ▓▓▓▓ ▓▓▓▓ I also spoke to ▓▓▓▓ who advised she wanted to press charges if a crime was committed. Gonzales conducted a full body inspection of ▓▓▓▓ and did not find any other injuries.

7. Det. Hibner photographed ▓▓▓▓ and the injuries. The photos are attached to this report and a copy was placed into evidence.

8. Det. Hibner and I conducted a recorded interview with Nadine Torres-Sosa. She stated she was a substitute aide and has been assigned to Carter's class for the last few days. Sosa advised there was also another Special Programs Teacher Assistant (SPTA) that was assigned to the class, identified as Erin Labourdette.

9. Sosa stated that she has witnessed behavior by Carter that concerned her. Sosa said on 05/02/18 at about 0930 hours, she was sitting on the floor next to ▓▓▓▓ and he had his shoes off. Carter was yelling at him to put his shoes on and then grabbed a pointer and swung the pointer at ▓▓▓▓ lower legs and ankle area hitting him about five times. Carter was swinging the pointer hard enough that she could hear it making noise as it was moving through the air. On the last swing the pointer broke and Carter stated, "I have more of those" and then threw the broken pointer in the garbage.

10. Sosa said ▓▓▓▓ yelped and was crying a little and appeared to feel pain but seemed to be ok shortly afterwards. She said ▓▓▓▓ was wearing jeans and she could not see any injuries on him. Sosa advised that later in the day, about 1300 hours, she changed ▓▓▓▓ and noticed red marks above his ankles.

11. Sosa said when Carter grabbed the pointer and approached ▓▓▓▓ he crunched into the fetal position and began to cover his legs with his hands. Sosa said it appeared as if he was hit with the pointer before and was afraid.

12. Sosa described the pointer as a wooden stick with a rubber hand pointing a finger on the end of it. The stick was about one to two feet long. The broken pointer was not available for evidence due to the fact that the garbage was already placed in the dumpster the night before and picked up in the morning. There were three other pointers located in Carter's classroom which Sosa said were similar. They were photographed and the photos attached to this report.

13. Sosa stated that Labourdette was present in the room when the incident occurred and she witnessed it. Labourdette was sitting about 10 feet away when the incident occurred. Sosa said she was sitting right next to ▓▓▓▓ when it occurred.

14. I asked Sosa how she felt about the incident and she stated she though it was unreal and felt shocked and angry.

SPC-R131.1 [Rev 09-10]

CCSDPD
AFFIDAVIT (N.R.S. 171.106)
Page 3 of 4

15. I asked Sosa if there were any students in the classroom that were verbal and she said there were three non-special needs students who were peers assigned to the classroom. Sosa said on the day of the incident only two were present. They were identified as ▆▆▆ and ▆▆▆▆▆ who were ▆▆ sisters.

16. I contacted ▆▆▆ and ▆▆▆▆ mother, identified as ▆▆▆▆▆▆, and she explained to her the situation and she gave consent for CPS to conduct recorded interviews with ▆▆▆ and ▆▆▆

17. CPS Investigator Yvette Gonzalez and I conducted a recorded interview with ▆▆▆ ▆▆▆▆ (DOB ▆▆▆▆) who stated Ms. Carter uses pointers to show them the ABC's and numbers. When asked if Carter used the pointers for anything else she said Carter hits ▆ (▆▆▆▆ ▆▆▆▆) in his legs with it when he's being mean and because he was taking his shoes and socks off. ▆▆▆▆ said Carter hits him on the foot and bottom of his feet, also on his legs and tummy with the pointer.

18. Gonzalez showed ▆▆▆▆ the three pointers (2 plastic and 1 wooden) and asked her which one Carter hit ▆▆▆▆ with. ▆▆▆▆ pointed to the wooden pointer. She said it broke after she hit him with it. ▆▆▆▆ stated that seeing carter hit ▆▆▆▆ with the pointer made her feel sad.

19. Gonzalez and I conducted a recorded interview with ▆▆▆▆▆▆ (DOB ▆▆▆▆) who stated she was in Carter's class but only in the afternoon and had a different teacher in the morning. ▆▆▆▆ says Carter uses the pointers for pointing to thing and sometimes points it to ▆▆▆▆ and another student named ▆▆▆▆ when they are mean. ▆▆▆▆ said she never seen Carter hit them with the pointer. She said one time Carter broke a pointer by bending it.

20. Although ▆▆▆▆ was not present during the incident she corroborates that Carter uses the pointers and has pointed it towards ▆▆▆▆ in the past.

21. Det. Hibner and I conducted a recorded interview with Erin Labourdette who stated she was an SPTA in Carter's classroom since the beginning of the school year. She said on the day of the incident she had her back to ▆▆▆▆ and heard a tapping noise so she turned to look over shoulder and saw Carter tapping ▆▆▆▆ with the pointer. Labourdette said Carter was not hitting him hard and was just tapping him on the right side of his body. She heard Carter say, "Oh, now I broke my stick," but she did not see how she broke it. Labourdette advised ▆▆▆▆ was sitting on the floor when the incident occurred.

22. Labourdette said she changed ▆▆▆▆ later in the day and did not see any marks or bruises on him.

CCSDPD
AFFIDAVIT (N.R.S. 171.106)
Page 4 of 4

23. Labourdette described the pointer as a wooden stick with a rubber hand on the end of it with a pointed finger. She said in order to break the wood it would have to be hit hard against something. Labourdette said she has seen Carter tap kids with the pointer but never seen her hit them hard. She said she has never had to step in the stop Carter from getting physical with the students.

24. The interviews and photographs were burned to a CD and placed into evidence at the CCSDPD Main Station. A copy was also attached to this report and submitted to records.

25. I contacted Melody Carter who stated she wanted to speak to me; however would like to discuss the matter with her husband prior to giving a statement. Carter provided me with her Nevada Driver License # ▓▓▓▓▓ for proof of identification. I gave Carter my business card and advised her to call me when she was ready to set up a time for an interview. I later received a phone call from Attorney Tanasi that he was representing Carter. I have not been able to reach Tanasi to discuss obtaining a statement from Carter.

26. Due to the fact Carter willfully and unlawfully hit ▓▓▓▓▓ with a wooden pointer which caused him to curl into a fetal position when he saw her holding the pointer; the fact Sosa could hear the pointer moving through the air which proved that Carter was swinging the pointer hard enough to cause pain and injury; the fact ▓▓▓▓▓ cried after being hit and the strikes were enough to break the wood pointer ▓▓▓▓▓ had bruises that were consistent with being hit; witnesses stated they saw Carter hit ▓▓▓▓▓ with the pointer; which are actions and behavior that can be terrorizing, painful and emotionally traumatic to a child, Carter did commit Child Abuse, Neglect or Endangerment upon ▓▓▓▓▓ as these actions placed him in a situation where he suffered physical harm as a result of negligent treatment or maltreatment. There is probable cause for one count of Child Abuse (NRS 200.508.1b) which is a Category B Felony.

Wherefore, affiant prays that a warrant of arrest be issued for suspect **Melody Carter** on a charge of **CHILD ABUSE (NRS 200.508.1B)**.

STATE of NEVADA

COUNTY of CLARK

_____
                    Affiant

# EXHIBIT 2

# EXHIBIT 2

# IMPARTIAL DUE PROCESS HEARING

## BEFORE THE HEARING OFFICER
## APPOINTED BY THE STATE SUPERINTENDENT OF PUBLIC SCHOOLS

### STATE OF NEVADA

In the matter of

STUDENT[1], by and through STUDENT'S Parents;

               Petitioner,

vs.

CLARK COUNTY SCHOOL DISTRICT;

               Respondent.

**DECISION**

Hearing Dates: April 9 & 10, 2019

Hearing Officer

Kevin P. Ryan, Esq.

Parties and Representatives:

Marianne C. Lanuti, Esq., Gregg A. Hubley, Esq., and Eugene Feldman, Esq., on behalf of Parents / Petitioner.

Daniel D. Ebihara, Esq., on behalf of Respondent.

## I.

## INTRODUCTION

Petitioner's Request for Due Process ("RDP") was received by respondent (sometimes referred to herein as the "district") on September 24, 2018. The IHO was appointed and received the RDP on October 3, 2018. The Preliminary Order was entered on October 4, 2018. The first Status Conference was scheduled for October 11, 2018, but as a result of a scheduling issue with petitioner, it did not occur until October 22, 2018. At the Status Conference, the parties demonstrated good cause and also stipulated that the deadline for decision in the case would be extended from December 8, 2018, until January 28, 2019.

The Notice of Pre-Hearing Conference was entered on October 29, 2018. On December 18, 2018, this matter came on for a Pre-Hearing Conference ("PHC"). At the conference, the parties indicated that a revised written offer of resolution was to be sent by respondent to petitioner. In addition, and as a result

---

[1]Personally identifiable information is attached hereto as Appendix A to this decision and must be removed prior to public dissemination.

1   of the holidays, the parties requested and stipulated to continue the PHC.

2        On December 27, 2018, this matter came on for the continued PHC. At the conference a discovery

3   issue was raised and the district indicated that the previously agreed upon hearing dates were no longer

4   workable. As a result of stipulation between the parties and a demonstration of good cause, the deadline

5   for decision was extended until March 15, 2019. In addition, the December 27, 2018, Order After Pre-

6   Hearing Conference included a deadline for production of information by the district and a briefing

7   schedule if a motion to compel was necessary.

8        An additional PHC took place on January 24, 2019. At the PHC, the IHO put legal counsel on

9   notice that in order to justify an award of compensatory education, evidence must be presented regarding

10   the focus and the amount of compensatory education requested. On February 1, 2019, the IHO issued his

11   Pre-Hearing Conference Report and Order. Thereafter, following receipt of Petitioner's February 2, 2019,

12   written Reply to Pre-Hearing Conference Report and Order dated February 1, 2019 ("Reply"), a follow up

13   PHC was conducted on February 12, 2019. The purpose of this PHC was to address the objections raised

14   by Petitioner in the Reply. At this PHC, the parties were able to agree on the 4 issues to be heard at the

15   hearing. The Amended Pre-Hearing Conference Report and Order was entered on February 13, 2019.

16        On February 20, 2019, based upon the joint request and stipulation of the parties, as well as a

17   finding of good cause, the IHO entered the Order After Telephonic Conference extending the deadline for

18   decision to April 22, 2019.

19        On March 27, 2019, the district filed its Statement of Concession of Issues ("Concession"). As a

20   result of this filing, the IHO issued a Pre-Hearing Order dated March 29, 2019. This Order provided in

21   relevant part that, "on or before April 3, 2019, Petitioner and Respondent shall submit Stipulated Findings

22   of Fact and Conclusions of Law to the IHO to be incorporated into the IHO's Order After Hearing. At the

23   hearing, the only issue for consideration shall be what if any remedy is Petitioner entitled to."

24        On April 3, 2019, the IHO received petitioner's proposed Stipulated Facts and Stipulated

25   Conclusions of Law. The district did not provide the IHO with either. Also, on April 3, 2019, the district

26   filed Respondent's Motion to Strike Witnesses and Exhibits. This motion was opposed by petitioner on

27   April 5, 2019. By way of email dated April 8, 2019, the district withdrew its original objection to the

28   timeliness of petitioner's disclosures, but reserved potential objections to exhibits presented at the hearing.

    The district's request to strike petitioner's witnesses resolved itself at the hearing when petitioner's only

1    witnesses were Student's parents.

2         The hearing was conducted on April 9th and 10th, 2019, in Las Vegas, Nevada. The record was

3    closed on April 10, 2019, after each party presented a closing argument. No additional briefing was

4    requested or ordered. Present at the hearing were Student's parents / petitioner, who were represented by

5    Marianne C. Lanuti, Esq., Gregg A. Hubley, Esq., and Eugene Feldman, Esq. Daniel D. Ebihara, Esq.,

6    appeared on behalf of respondent. Presiding over the hearing was independent hearing officer, Kevin P.

7    Ryan, Esq. ("IHO").

8         Student entered the district educational system during the 2016 - 2017 school year[2] before he was

9    four (4) years of age. Student is presently six (6) years of age and eligible to receive special education and

10   related services from the district under the eligibility category of Autism Spectrum Disorder[3] pursuant to

11   the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C §1400 et seq., 34 C.F.R. 300.100 et

12   seq., the Nevada Revised Statutes ("NRS"), Chapter 388 and the Nevada Administrative Code ("NAC"),

13   Chapter 388. Student is mostly non-verbal.[4]

14                                          II.

15                              **PRELIMINARY MATTERS**

16        Prior to the hearing the IHO issued orders adjudicating petitioner's Motion to Compel, Motion to

17   Associate Counsel, Reply to Pre-Hearing Conference Report and Order, Request for Reconsideration and

18   Request for Clarification, Second Motion to Compel Discovery and Requests for Subpoenas. In addition,

19   prior to the hearing the IHO issued an order denying the district's Motion to Exclude Consideration of

20   Audio Surveillance Device.

21        On April 9, 2019, at the commencement of the hearing and on the record, legal counsel for the

22   parties with the participation of the IHO spent approximately 2 hours working through and agreeing to

23   stipulated facts and stipulated conclusions of law. Those stipulated facts and stipulated conclusions of law

24   are set forth below. Thereafter on April 9, 2019, the evidentiary hearing commenced.

25

26   _____

27        [2]See Petitioner's Exhibit 9.

28        [3]See Petitioner's Exhibit 9, p. 209

          [4]See Petitioner's Exhibit 9, pp. 214-229 (2016 IEP)

                                          3

## III.

### HEARING ISSUE

The petitioner requested an award of compensatory education and an order allowing Student to wear / use the Angel Sense device while attending school.[5] Based upon the district's Concession, the stipulated findings of fact and conclusions of law, and the IHO's additional findings of fact and conclusions of law, what if any remedy is petitioner entitled to?

## IV.

### STIPULATED FINDINGS OF FACT

The factual findings enumerated at 1 through 26 were stipulated to by the parties on April 9, 2019, prior to taking additional evidence at the hearing. With the exception of the IHO removing personally identifiable information and making minor, non-substantive modifications, at the request of the parties the stipulated findings of fact are included verbatim. The stipulated findings of fact were entered into the record together with additional evidence that was admitted at the hearing on April 9th and April 10th, 2019. The IHO's findings of fact begin at number 27.

1.   On July 18, 2016, Student was enrolled at CCSD with eligibility for special education services based upon Autism Spectrum Disorder.

2.   Respondent conducted an IEP on July 18, 2016. Present Levels of Performance were noted and included social/emotional deficits.

3.   Student's July 18, 2016, IEP did not document any elopement behavior.

4.   On July 18, 2016, Respondent completed Supplementary Aids and Services which included a home/school communication system(setting home/school) and the use of positive behavioral strategies.

5.   Student's May 17, 2017, IEP documented that Student was observed spending "...a great deal of time crying and screaming."

6.   Respondent failed to adequately train and supervise relevant personnel in the delivery of positive behavioral strategies during the 2016-2017 academic year.

7.   During the 2016-2017 academic school year, Student was educated at a CCSD school. The school's principal had a duty to supervise staff associated with the education of Student.

---

[5]The description of the Angel Sense device is set forth in the Supplementary Aids and Services section of this order.

8.   During the 2016-2017 academic school year, Student was periodically deprived of water at school in violation of NRS Chapter 388.[6]

9.   During the 2016-2017 academic school year, Student was periodically deprived of food at school in violation of NRS Chapter 388.

10.   During the 2016-2017 academic school year, Student's parent's notified the CCSD Superintendent concerning issues with food and water.

11.   The CCSD failed to take corrective action during the 2016-2017 academic year to address the concerns raised by Student's parents as to food and water.

12.   During the 2017-2018 academic school year, Student was assigned to a new teacher of record ("TOR").

13.   During the 2017-2018 academic school year, the school's principal where Student attended school had a duty to supervise Student's TOR.

14.   During the 2017-2018 academic school year, Student's school principal / respondent failed to ensure proper training of relevant staff in Applied Behavioral Analysis, Positive Behavioral Strategies, Proper Restraint Training and Compliance with NRS Chapter 388.

15.   During the 2017-2018 academic school year, Student was a victim of repeated corporal punishment by his TOR including, but not limited to, being beaten across the ankles, lower legs and stomach region.

16.   On May 2, 2018, Student's TOR beat Student with a wooden pointer stick with such force it caused the wooden stick to break in two. After the pointer broke, Student's TOR was heard stating, "I have more of these."

17.   On May 3, 2018, a full day after the beating, respondent reported the beating to Student's parents. Student's principal signed an incomplete CCF 624 Form[7] describing the event.

18.   During the 2017-2018 academic school year, Student sustained injuries some of which were a result of corporal punishment, requiring examination by a CCSD school nurse. The April 30, 2018,

---

[6]The parties' stipulated factual findings 8, 9, 14, and 22, are more accurately conclusions of law and will be treated as such by the IHO.

[7]This is a form used by CCSD entitled Notice of Use of Physical Restraint, Mechanical Restraint or Aversive Intervention (CCF 624).

injury was not reported to Student's parents. The May 2, 2018, injury to Student resulting from corporal punishment was not reported to Student's parents until the following day.

19.    During the 2017-2018 academic school year, CCSD staff observed, but failed to report until the following day, the use of corporal punishment inflicted upon Student by Student's TOR.

20.    During the 2017-2018 academic school year, Respondent had a duty to adequately train and supervise relevant CCSD teachers and staff.

21.    During the 2017-2018 academic school year, Student engaged in acts of elopement that were not documented or reported to Student's parents.

22.    Respondent is responsible to train all staff in completing the CCF 624 paperwork correctly and in compliance with NRS Chapter 388.

23.    On May 3, 2018, respondent contacted CCSD Police to conduct an investigation. The broken pointer was not available for evidence due to the fact that the garbage was already placed in the dumpster the night before and picked up in the morning.

24.    On May 3, 2018, CCSD Police discovered three (3) wooden pointer sticks in Student's TOR's room.

25.    On May 3, 2018, a Child Protective Services investigator conducted an interview with a peer of Student's TOR who witnessed the abuse by Student's TOR. The witness said that Student's TOR would routinely hit Student with the pointer stick "when [Student] was mean," or when Student removed Student's shoes/socks.

26.    On June 7, 2018, a Criminal Complaint against Student's TOR was issued pursuant to NRS 200.508.1B for the May 2, 2018, beating of Student.

27.    During Student's first semester of the 2016-2017 school year Student was taken good care of, Student's teacher reported often to Student's parents, she kept her classroom clean and germ free, and Student suffered no injuries or mistreatment during this period of time.[8]

28.    After Student's first semester of school, his education and care declined.[9]

29.    During the second semester of the 2016-2017 school year, Student's parents packed food

_____

[8]Testimony by Student's mother.

[9]Testimony by Student's parents.

6

1   and water for Student that on many occasions came back home with student untouched.  Student would

2   return from school hungry and thirsty.[10]

3        30.    During the second semester of Student's 2016-2017 school year, Student's diapers were not

4   changed when necessary and he was required to be in soiled diapers for extended periods of time.[11]

5        31.    During the 2016-2017 school year Student was absent a total of 67 times (34 times in the

6   AM, 33 times in the PM).  During the 2017-2018 school year Student was absent a total of 122 times (61

7   times in the AM, 61 times in the PM).  And, during the 2018-2019 school year Student was absent a total

8   of 24 times (12 times in the AM, 12 times in the PM).[12]

9        32.    Student's frequent health issues caused Student's absenteeism.[13]

10       33.    No evidence was presented by either party regarding the appropriate amount of

11   compensatory education to be awarded to Student.[14]

12       34.    No evidence was presented regarding the specific focus of the compensatory education

13   requested by petitioner to be awarded directly to Student.

14       35.    Presently, Student continues to does elope on occasion.[15]

15       36.    Regarding Student's elopement, at no time has Student been able to escape from the

16   school's premises and Student is usually found inside in the school library, on the stairs, or in the teacher's

17   lounge.[16]

18       37.    Presently there is a safety plan in place at Student's school to address Student's

19

20

21   ─────────────────

22       [10]Testimony by Student's parents.

23       [11]Testimony by Student's parents.

24       [12]District's admitted Exhibits 2-4.

25       [13]Testimony by Student's father.

26       [14]After the close of the evidence, but in petitioner's closing argument, petitioner requested 585
     hours of compensatory education for Student to be divided equally between Student and Student's teachers,
27   staff, and aides.

28       [15]Testimony by Student's current principal.

         [16]Testimony by Student's current principal.

7

1  elopement and locate Student when he gets out of the classroom.[17]

2       38.    Student will bang his head against the floor or other objects when upset.[18]

3                                          V.

4        **ANALYSIS / STIPULATED AND ADDITIONAL CONCLUSIONS OF LAW**

5        The conclusions of law set forth below and designated A through F were stipulated to by the parties

6  on April 9, 2019, prior to taking evidence at the hearing and are included verbatim.   The remainder of the

7  conclusions of law were determined by the IHO based upon his independent legal research.

8        A.     The Respondent's staff allowed Student to be subjected to interventions that were

9  inconsistent with the Student's IEPs.

10       B.     The Petitioner's right to meaningful participation in the Student's 2016, 2017, and 2018

11 IEP processes was significantly impeded due to the failure of the Respondent to report aversive

12 interventions and interventions that were contrary to the Student's IEP.

13       C.     The Respondent used inappropriate interventions that were contrary to the Student's IEP

14 and failed to report the use of these interventions to the Student's parents.

15       D.     The Respondent's failure to appropriately intervene resulted in a deprivation of the

16 Student's educational benefits.

17       E.     The Respondent failed to place the Student in the least restrictive environment, and this

18 resulted in the denial of FAPE by Respondent.

19       F.     The Respondent failed to provide staff who were properly trained and supervised in

20 appropriate behavioral interventions.

21       Compensatory Education:

22       Petitioner has requested compensatory education for Student as a part of the requested remedy.

23 Petitioner's request has two prongs, direct compensatory education for Student and individualized training

24 for Student's principal, teachers, aides and support staff.   "Compensatory education is not a contractual

25 remedy, but an equitable remedy, part of the court's resources in crafting 'appropriate relief.'" Student W

26 v. Puyallup School District, No. 3, 31 F.3d 1489 (9th Cir.), 21 IDELR 723 (1994). "Appropriate relief is

27 _____

28       [17]Testimony by Student's current principal.

         [18]Testimony by Student's parents and current principal.

                                          8

1  relief designed to ensure the student is appropriately educated within the meaning of the Individuals with
2  Disabilities Education Act." Student W, 31 Fed.3d at 1497.  Moreover, "there is no obligation to provide
3  a day-for-day compensation for missed time."  Id.  In addition, compensatory education services for a
4  student may be made in the form of individualized instruction for a student's teachers.  Park v. Anaheim
5  Union High School District, Greater Anaheim SELPA, 444F.3d 1149 (9th Cir.), 45 IDELR 178 (2006).

6       The stipulated facts indicate that during the 2016-2017 school year, Student was deprived of food
7  and water on a number of occasions.  Student's parents packed food and water for Student that on many
8  instances came back home with student untouched.  Thereafter, Student's mother resorted to sending
9  Student with dyed water to see if it was actually being consumed by Student.  In addition, the stipulated
10 facts indicate that although these deprivations were reported to the district, no corrective measures were
11 taken.  The IHO also heard credible testimony from Student's parents that during the 2016-2017 school
12 year, Student's diapers were not changed when necessary and Student was required to be in soiled diapers
13 for extended periods of time.

14      With regard to Student's 2017-2018 school year, the stipulated facts provide that during this time
15 period Student engaged in acts of elopement.  Additionally, Student was a victim of repeated corporal
16 punishment by his teacher including, but not limited to, being beaten across the ankles, lower legs and
17 stomach region with a wooden pointer.  This conduct was witnessed by the teacher's peer who indicated
18 that this physical punishment was "routine." The stipulated facts further indicate that a criminal complaint
19 was brought against Student's teacher regarding the May 2, 2018, beating of Student.

20      Regarding the Student's special needs and development after the first semester of the 2016-2017
21 school year, Student's father indicated that Student's primary issues involved his delayed speech and lack
22 of motor function. Student's father indicated the that Student's motor function has not improved and that
23 there has been no progress regarding Student's speech.  This parent also indicated that Student's head
24 banging has increased and become more violent. Finally, Student's father testified that presently Student
25 does not want to get out of his vehicle to attend school and that generally Student has regressed.

26      However, Student's current principal testified that in the 2018-2019 school year, Student has shown
27 growth. Student elopes less, Student's stemming behavior has decreased, Student sits in "circle time" and
28 stays on task up to 10 minutes. Student's principal also testified that Student's absences have decreased.

1    The stipulated facts also provide that: (1) during the 2017-2018 academic school year the district

2    failed to ensure proper training of relevant staff in Applied Behavioral Analysis, Positive Behavioral

3    Strategies, Proper Restraint Training and Compliance with NRS Chapter 388; (2) during the 2017-2018

4    academic school year, district staff observed, but failed to timely report the use of corporal punishment

5    inflicted by staff upon Student; (3) during the 2017-2018 academic school year, the district had a duty to

6    adequately train and supervise its teachers and staff; and, (4) the district is responsible to train all staff in

7    completing the CCF 624 paperwork correctly and in compliance with NRS Chapter 388, yet on May 3,

8    2018, a district administrator signed an incomplete CCF 624 describing the May 2, 2018 event.

9    Regarding the focus and amount of direct compensatory education for Student, the IHO notes that

10    no expert testimony was presented at the hearing regarding Student's loss of educational benefit or his

11    present educational needs. In addition, no evidence was presented regarding the focus or the amount of

12    compensatory education requested. The only mention of compensatory education or the appropriate

13    amount of same occurred in the closing arguments of the parties.

14    In the district's closing argument, it conceded that an award of compensatory education was

15    appropriate. Yet, it did not offer evidence regarding the focus of the compensatory education for Student.

16    In addition, the district argued that the IHO should focus on the period of time following Student's first

17    semester of the 2016-2017 school year because it was undisputed that Student was well cared for and

18    appropriately educated during that period of time. Regarding the amount of compensatory education to

19    be awarded, the district argued that the IHO should rely on its Exhibits 1-4 which included the school

20    calendars for the 2016-2017, 2017-2018, 2018-2019 school years, as well as Student's attendance records

21    for those periods of time.[19] Regarding this argument, Student's parents both testified that commencing the

22    second semester of the 2016-2017 school year, due to the lack of cleanliness in Student's classroom, he

23    was often sick which sicknesses included strep throat, thrush, whooping cough and fever. Student's

24    parents further testified that they were required to take Student to urgent care on many occasions and that

25    ...

26

27    ———————————————

28    [19]According to the district's Exhibits 2-4, during the 2016-2017 school year Student was absent a
total of 67 times (34 times in the AM, 33 times in the PM), during the 2017-2018 school year Student was
absent a total of 122 times (61 times in the AM, 61 times in the PM), and during the 2018-2019 school year
Student was absent a total of 24 times (12 times in the AM, 12 times in the PM).

1  Student's poor health was a result of the classroom conditions.

2       In petitioner's closing argument, petitioner argued that the IHO should award 585 hours of

3  compensatory education which computes to ½ of a school year based upon 6.5 hours per day of education

4  time. In addition, the petitioner argued that this amount of compensatory education should be divided

5  equally between additional educational services for Student, and training for Student's principal, teachers,

6  service providers and aides. No evidence or argument was offered regarding what educational areas were

7  to be focused on and how much time would be devoted to each area.

8       To be clear, credible but general evidence was presented that student "regressed", that Student

9  continues to elope, that Student continues to bang his head, that Student's motor function has not

10  improved, and that there has been no progress regarding Student's speech. And, a reasonable person could

11  logically and equitably conclude that any student who is physically abused, denied food and water, and not

12  cared for in a clean / sanitary, and safe environment would have a difficult time receiving the education

13  benefit mandated by the IDEA.[20] However, an unsupported and general request for an indiscriminate

14  amount of compensatory education cannot be granted.

15      Supplementary Aids and Services:

16       As a part of petitioner's requested remedy, petitioner seeks an order allowing the use of "Angel

17  Sense" by Student when at school. Angel Sense is an electronic device that is worn on the body which

18  allows for electronic tracking of the user, and also transmits, but does not record conversations whereby

19  any individual who is in possession of the monitor may listen in contemporaneously.

20       Pursuant to 34 CFR 300.42, *supplementary aids and services* means aids, services and other

21  supports that are provided in regular education classes, other educational-related settings, and in

22  extracurricular and non-academic settings to enable children with disabilities to be educated with non-

23  disabled children to the maximum extent appropriate with section 300.114 through section 300.116. (See

24  also NAC 388.132) Moreover, pursuant to 34 CFR 300.5, an "assistive technology device" is defined as

25  a piece of equipment, "that is used to increase, maintain, or improve the functional capabilities of a child

26  with a disability." Finally, regarding the definition of an IEP and the inclusion of *supplementary aids and*

27  *services*, the use of same is to enable a student to, advance appropriately toward attaining annual goals, to

28

---

[20]The IHO also notes that pursuant to Conclusion of Law "C", the parties stipulated that the district's failure to appropriately intervene resulted in a deprivation of the Student's educational benefit.

1  be involved in and make progress in the general education curriculum..., and to be educated and participate

2  with other children with disabilities and non-disabled children in the activities described in this section.

3  (See 34 CFR 300.320(4))

4       In the State of Nevada, absent consent by one person to a conversation, for privacy reasons the law

5  prohibits the surreptitious listening into any private conversation. (See NRS 200.650) Moreover, pursuant

6  to NRS 393.400, it is unlawful to engage in any kind of surreptitious electronic surveillance at a public

7  school without the knowledge of the person being observed. An exception to the rule is that electronic

8  surveillance is allowed if necessary as a part of a system of security used to protect and ensure the safety

9  of persons on the property of a public school. (See NRS 393.400(2)(d))

10       In the case Pollack v. Regional School Unit 75, 886 F.3d 75 (1st Cir.), 71 IDELR 206 (2018), a

11  student's parent requested that the student be allowed to wear an electronic recording device at school.

12  The student was autistic and non-verbal. However, the student had been attending school in the district

13  for 12 years and had made continuous educational progress; he was receiving a FAPE. In issuing the

14  decision the IHO concluded that the recording device was not required under the IDEA. The IHO

15  determined that the need for a recording device was not a safety issue, the student was receiving a FAPE,

16  and that it was unnecessary for the student to wear a recording device to benefit educationally.

17       In the present case, it is an undisputed fact that Student continues to elope. Student's desire to

18  leave when over-stimulated and his need for supervision is documented as far back as his July 18, 2016,

19  IEP.[21] In addition, Student's parents testified that Student continues to try and elope and on one occasion

20  while Student's father was at Student's school, Student was left unattended and did elope. Student's father

21  was the one who found Student in the school library.[22]

22       Furthermore, Student's current principal testified that although Student did elope from his

23  classroom, at no time was Student able to leave the school's campus. This evidence was not contradicted

24  and the IHO found Student's principal to be credible. In addition, Student's principal testified about the

25  safety plan that is in place at Student's school to address Student's elopement. Pursuant to the safety plan,

26  certain teachers, administrators and staff have 2-way radios. When Student elopes, all persons with radios

27

28       [21]See Petitioner's Exhibit 9, pp. 214-229.

     [22]Student's father's testimony.

                                    12

1    are notified to be on the look out and the exit doors for the school are blocked. Consistent with Student's

2    father's testimony, Student's principal confirmed that typically when student elopes Student ends up in the

3    school library, on the stairs or in the teacher's lounge. Student's principal also confirmed that when the

4    school day ends, Student is always picked up at the front desk by a parent of Student.

5          With regard to the elopement issue, the Angel Sense device is unnecessary. The undisputed

6    evidence is that although Student tries to and sometimes does elope, he has never made it off school

7    premises and is usually found in one of three quiet places inside the school. Furthermore, the Angel Sense

8    device is also not necessary for the safety of the eloping Student because a safety plan is in place and to

9    date the safety plan has worked. Finally, this product does not fall within the definition of a

10   "supplementary aid or service", or an "assistive technology device". The use of Angel Sense will not

11   further enable Student to be educated with non-disabled children to the maximum extent, it will not

12   increase, maintain, or improve Student's functional capabilities, and its use will not provide Student with

13   an educational benefit.

14         As also discussed above, it is undisputed and ample evidence was presented proving that Student

15   was physically abused by a former teacher while attending school during the 2017-2018 school year.[23]

16   Petitioner offered and had admitted into evidence the criminal complaint against Student's former teacher,

17   the School Police Department Affidavit pertaining to its investigation, as well as images of Student's

18   injuries.[24] In addition, both Student's mother and father testified about the unexplained bruising on

19   Student's body and the pointer shaped welts and poke marks that were discovered on Student's torso and

20   legs. Regarding the injuries to Student that were not reported to Student's parents on May 3, 2018, upon

21   inquiry Student's parents testified that they were routinely told that these injuries happened "on the

22   playground."[25]

23         With regard to Student's safety and the legality of the use of Angel Sense at a Nevada public

24

25          [23]See Stipulated Facts, 15 and 19 above.

26          [24]See Petitioner's Exhibits 2 and 8.

27

28          [25] Student's parents were unable to confirm Student's playground injuries, and Student's principal
     admitted in her testimony that although there are surveillance cameras at Student's current school that
     would cover the school's playground, she believed that those cameras had been inoperable for more than
     3 years.

                                                      13

1  school, the contemporaneous transmission of conversations is a complex issue. The gravity of the abuse

2  of Student by his former teacher cannot be ignored or trivialized. The teacher's conduct was deplorable

3  and Student suffered at her hands. However, there is no evidence to prove how the use of Angel Sense

4  could have in the past or will in the future protect Student from abuse. Even if someone is listening in at

5  all times, it cannot be concluded that physical violence will be prevented. And, there is no practical way

6  to obtain consent from or give notice to every person who may be overheard talking to another within range

7  of the Angel Sense device. Because Nevada law precludes surreptitious electronic listening / surveillance,

8  the Nevada legislature, not this IHO, should be tasked with deciding whether or not Nevada law should

9  be modified.

## VI.

## DECISION AND ORDER

Based upon the foregoing, it is hereby ordered as follows:

1.  Based upon the absence of evidence pertaining to the specific areas of Student's alleged educational deprivation, what specific services are needed to remedy the denial of a FAPE, and the appropriate amount of compensatory education for Student in each alleged area of educational deprivation, the IHO is without a basis to make an award whereby no direct compensatory education for Student is ordered.

2.  Student is awarded compensatory education for Student's principal, teachers, service providers, and all other staff / aides that are assigned to work with Student in the present school year, as well as in the 2019-2020 school year. Each such individual shall receive a total of four (4) hours of compensatory education that shall be provided by the district. This compensatory education shall include individualized instruction pertaining to the definition of and prohibition against aversive interventions, the proper reporting and documentation of aversive interventions, the use of positive behavior plans and supports including those set forth in Student's current and future IEPs, proper restraint training, and compliance with NRS Chapter 388. For Student's current principal, teachers, service providers, and all other staff / aides that are assigned to work with Student, this instruction / training shall be completed before the commencement of the 2019-2020 school year. For Student's future principal, teachers, service providers, and all other staff / aides that are

14

assigned to work with Student, this instruction / training shall be completed before the conclusion of the first semester of the 2019-2020 school year.

3.    Student shall not be allowed to wear / use the Angel Sense device while attending school.

VII.

## NOTICE OF RIGHT TO APPEAL

A party aggrieved by this Decision has the right to appeal within thirty (30) days of the receipt of this decision pursuant to NAC §388.315. A party to the hearing may file a cross-appeal within ten (10) days after receiving notice of the initial appeal.  If there is an appeal, a state review officer appointed by the superintendent from a list of officers maintained by the Nevada Department of Education shall conduct an impartial review of the hearing pursuant to NAC 388.315.  Because this decision is being delivered in both electronic and hard copy, receipt of a copy of this Decision will be determined by either the date of actual delivery or the date of the first attempt to deliver by the U.S. Postal Service.

Dated: April 22, 2019.

Hearing Officer
Kevin R. Ryan, Esq.
232 Court Street
Reno, Nevada 89501
(775) 322-5000
trialryan@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I served a true copy of the foregoing document on the party(ies) identified below by:

   XXX        Placing an original or true copy thereof in a sealed envelope, postage prepaid, placed for collection and mailing in the US Mail at Reno, Nevada.

   _____        Personal delivery.

   _____        Electronic Mail

   _____        Facsimile to the following number.

   _____        Federal Express or other overnight delivery.

   _____        Certified Mail Return Receipt Requested.

addressed to:

Marianne C. Lanuti, Esq.
Law Offices of Marianne C. Lanuti
194 Inveraray Ct.
Henderson, Nevada 89074
NvKidsLaw@gmail.com

Gregg A. Hubley, Esq.
Arias Sanguinetti Wang & Torrijos
7201 W. Lake Mead Blvd., Ste. 570
Las Vegas, NV 89128
gregg@aswtlawyers.com

Eugene Feldman, Esq.
Arias Sanguinetti Wang & Torrijos
6701 Center Drive West, 14th Floor
Los Angeles, CA 90045
eugene@aswtlawyers.com

Daniel D. Ebihara, Esq.
4170 McLeod Dr.
Las Vegas, NV 89121
ebihadd@nv.ccsd.net
bigaytd@nv.ccsd.net

**DATED** this 22nd day of April, 2019.

Tanneil M. Klrk