UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

J.W., a minor by and through his Parents, Joshua and Britten Wahrer,

                Plaintiffs,

    v.

CLARK COUNTY SCHOOL DISTRICT, *et al.*,

                Defendants.

Case No. 2:19-cv-00965-RFB-EJY

**ORDER**

## I.    INTRODUCTION

Before the Court are three motions for summary judgment: Plaintiffs' Motion for Partial Summary Judgment against Defendant Carter (ECF No. 77); Defendant Clark County School District's Motion for Partial Summary Judgment (ECF No. 100); and Plaintiffs' Motion for Partial Summary Judgment against Defendant Clark County School District (ECF No. 105).

For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment against Defendant Carter is DENIED; Defendant Clark County School District's Motion for Partial Summary Judgment is DENIED; and Plaintiffs' Motion for Partial Summary Judgment against Defendant Clark County School District is GRANTED in part and DENIED in part.

## II.    PROCEDURAL HISTORY

On May 2, 2019, Plaintiffs filed this matter in state court, alleging claims of assault, battery, negligence, negligent hiring, training, and supervision, intentional infliction of emotional distress, and violations of federal substantive due process, equal protection, and rights under the Americans with Disabilities Act ("ADA"), and Article I, § 9 of the Nevada Constitution. ECF No. 1-1. On

June 6, 2019, Defendants removed the matter to this Court. ECF No. 1. On June 13, 2019, Defendants Clark County School District ("CCSD") and Pat Skorkowsky filed a Motion to Dismiss. ECF No. 6. Plaintiffs responded and Defendants replied. ECF Nos. 14, 16. The Court held a hearing on the Motion to Dismiss on May 10, 2020. ECF No. 35. The Court granted in part and denied in part the motion. Id. The Court dismissed Defendant Skorkowsy from suit, dismissed the claim under N.R.S. § 41.1395 for special damages, and dismissed the claim for negligent hiring and training, but permitted the claim to proceed insofar as it was based on negligent supervision. On February 23, 2021, Plaintiffs filed a Motion to Amend Complaint. ECF No. 62. Discovery closed on March 18, 2021. ECF No. 56.

On April 30, 2021, Defendants filed a Motion in Limine "to preclude reference to due process proceedings and related stipulations." ECF No. 74. Plaintiffs responded on May 14, 2021. ECF No. 90. Defendants filed a Motion for Leave to File Reply in Support of its Motion in Limine on May 21, 2021. ECF No. 93.

Plaintiff also filed a Motion for Summary Judgment Against CCSD, ECF No. 75, and a Motion for Partial Summary Judgment against Carter, ECF Nos. 75, 77. The same day, Defendant CCSD filed a Motion for Partial Summary Judgment. ECF No. 79, 81. On May 18, 2021, Magistrate Judge Youchah granted Plaintiffs' Motion to Amend Complaint, and ordered that Plaintiffs' Motion for Summary Judgment against CCSD and Defendant CCSD's Motion for Summary Judgment be vacated to allow for prompt refiling that addresses Plaintiff's amended complaint. ECF No. 91.

Plaintiffs filed the First Amended Complaint ("FAC") on May 21, 2021. ECF No. 94. The FAC alleges claims for assault, battery, negligence, and intentional infliction of emotional distress against Defendant Carter. The FAC alleges the same state law claims against Defendant CCSD, as well as the additional state tort claim of negligent supervision. In addition, as to Defendant CCSD, Plaintiffs assert claims for violations of J.W.'s constitutional rights to substantive due process and equal protection, as well as for alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and for alleged violations of the Rehabilitation Act of 1973 ("RA").

2

Defendant CCSD refiled its Motion for Partial Summary Judgment on June 17, 2021. ECF No. 100. Defendant also filed a Motion to Seal Exhibits 2, 9, 12, and 15 to CCSD's Response to Plaintiffs' Motion for Summary Judgment. ECF No. 113. Plaintiff refiled its Motion for Partial Summary Judgment on June 21, 2021. ECF No. 105. Both refiled Motions for Summary Judgment were fully briefed by July 23, 2021. ECF Nos. 116, 117.

On March 11, 2022, the Court held an omnibus hearing on the pending motions. ECF No. 119. The Court denied without prejudice Defendant Clark County School District's Motion in Limine and deferred decision on the motions for summary judgment. Id. The Court continued the hearing, ordered that the parties submit expedited briefing on the issue of administrative exhaustion, and required the parties to file "a full copy of the transcript(s) of the IDEA hearing(s) and any filings or decisions that were made by the hearing officer regarding discovery." Id.

On March 12, 2022, Plaintiffs and Defendant Clark County School District filed supplements and exhibits consistent with the Court's order. ECF Nos. 120-122. On March 14, 2022, Plaintiffs and Defendant Clark County School District filed supplemental briefs consistent with the Court's order. ECF Nos. 123, 124. The Court held a second hearing on March 15, 2022 and took under submission the parties' arguments regarding the three motions for summary judgment. ECF No. 126.

This order follows.

### III.     FACTUAL BACKGROUND

####     a.   Undisputed Facts

The Court finds the following facts to be undisputed based on the parties' briefs and the record.

Plaintiff J.W. is a non-verbal autistic child. J.W. received special education at Harley Harmon Elementary School during the 2016-2017 and 2017-2018 school years. Harley Harmon is within the Clark County School District ("CCSD"). At all relevant times, Shannon Schumm was the principal of Harley Harmon Elementary School. In May and June 2017, J.W.'s parents notified Principal Schumm of their concern that J.W. was not getting the food and water that they were

sending to school. They also expressed concern that J.W. was being sent home with a full diaper and was urinating through his pants. J.W.'s parents removed him from school before the 2016-2017 school year was over out of concerns for his safety. He returned to Harmon for the 2017-2018 school year.

During the 2017-2018 school year, Defendant Carter became J.W.'s teacher. During the 2017-2018 school year, J.W.'s parents began to notice bruising on J.W.'s body. In April 2018, J.W.'s mother spoke to Defendant Carter and classroom aides about the bruises she had seen on J.W.'s body. She was told that the bruising occurred when J.W. fell on the playground.

On May 3, 2018, Nadine Torres-Sosa – a substitute teacher assigned to Defendant Carter's classroom – prepared a written report (the "Sosa Report" or "Report") describing concerns she had about how Defendant Carter treated J.W. The Sosa Report indicated that Sosa had observed Carter and Carter's classroom aide, Erin Labourdette, physically and verbally abusing J.W. Among other things, the Report stated that Sosa saw Carter hit J.W. with a pointer stick on his feet when he would not put his shoes on, breaking the stick; that Carter yelled at J.W.; that Carter confined students between two cabinets in a small, dark and mostly enclosed space as punishment; that Carter would intentionally drop J.W.'s hand when he resisted her, causing him to fall to the ground; and that Carter yanked J.W. under her desk, forced him to remain there, and told Sosa, "that's where he likes to sleep."

Principal Shannon Schumm received the Sosa Report, reported to her supervisor in the Employee Relations Management ("ERM") Department, and called CCSD School Police as well as Child Protective Services ("CPS"). CCSD Police and CPS began investigating Carter and Labourdette's alleged conduct. CPS later interviewed Erin Labourdette, who confirmed that she saw Defendant Carter strike J.W. with the pointer stick, and that the pointer stick broke. Labourdette prepared a written statement regarding Carter's behavior in the classroom, in which she confirmed that Carter used the pointer stick on J.W.'s body, that she and Carter put students in the cabinet enclosure for "quiet time," and that Carter directed J.W. to sit under her desk.

The school nurse examined J.W. for injuries and found bruises on his ankles. On May 3, 2018, Carter and Labourdette were suspended. The police concluded that there was evidence for

4

one count of child abuse against Carter. Police found there was insufficient evidence to conclude that Labourdette knowingly and willfully failed to report child abuse or that she had committed child abuse. Principal Schumm did not attempt to speak with Carter until after Carter's criminal case was closed on July 30, 2018. Carter resigned from employment at CCSD on August 8, 2018, prior to her noticed interview with Principal Schumm. Labourdette returned to work on August 8, 2018. Carter admitted in depositions to using the pointer stick on J.W.'s feet. She also admitted to having him sit under her desk and to placing him in a partially enclosed space for discipline.

b. Disputed Facts

The Court finds the following facts to be in dispute: whether any CCSD employee intentionally withheld food or water from J.W. or refused to change his diapers during the 2016-2017 school year; whether at any point Principal Schumm or other CCSD staff addressed Plaintiffs' concerns regarding J.W.'s alleged food and water deprivation and soiled diapers; whether Defendant Carter used corporal punishment against J.W.; whether any corporal punishment Carter used against J.W. caused serious injury; whether Carter hit or beat J.W. with a pointer stick; whether Carter yanked J.W. under her desk and forced him to sit there; whether Carter kept J.W. in a small, dark and enclosed space for long periods of time to punish him; whether Carter did anything to intentionally cause J.W. to fall to the ground; and whether Principal Schumm knew or should have known of Carter's disciplinary methods in her classroom prior to receiving the Sosa Report.

IV.   **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must

do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). The nonmoving party may not merely rest on the allegations of her pleadings; rather, she must produce specific facts—by affidavit or other evidence—showing a genuine issue of fact. Anderson, 477 U.S. at 256. It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

V.      **DISCUSSION**

a.   Judicial Estoppel

As a preliminary matter, Plaintiffs' arguments in support of their partial motion for summary judgment against Defendant CCSD are premised in large part upon a set of stipulated facts that were entered in an earlier administrative action that Plaintiffs brought under the Individual with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. § 1400 et seq. Those stipulations contain admissions by CCSD regarding J.W.'s treatment by Carter and other staff during the 2016-2017 and 2017-2018 school years, as well as admissions regarding the school district's knowledge of J.W.'s abuse and neglect. Plaintiffs argue that CCSD should be bound to the stipulated facts that were agreed upon in the IDEA proceeding through the doctrine of judicial estoppel. CCSD argues that it should not be bound to those stipulations, as they were made during an administrative process under the condition that they would not be used in future proceedings. Because the earlier stipulated facts may bear upon this Court's resolution of the motions currently before it, the Court will first discuss whether the stipulations from the IDEA proceeding have preclusive effect in this action.

On September 24, 2018, Plaintiffs brought an IDEA action against CCSD, alleging that that CCSD failed to provide J.W. with a free appropriate public education ("FAPE") as required under the Act. Plaintiffs sought various remedies – most notably compensatory education in the form of supplementary aids and services for J.W., for educational benefits that he was denied,

beginning in September 2016. Between September 24, 2018, and March 2019, Plaintiffs requested information from CCSD regarding the alleged abuse of J.W., including documentation of the incidents of abuse or of aversive interventions that Defendant Carter or her aides had used in class. Aversive interventions are defined by Nevada law as the punishment of a student with a disability to reduce maladaptive behavior; aversive interventions can include corporal punishment, verbal or mental abuse, seclusion, mechanical or physical restraints, and deprivation of food and water. Nevada Revised Statutes ("N.R.S.") § 388.473. CCSD policy prohibits the use of aversive interventions on students with disabilities except under certain circumstances, such as when the student poses a risk of immediate physical harm to himself or others.

On March 27, 2019, CCSD submitted a "Statement of Concession of Issues" (the "Statement"), in which it stated that CCSD "concedes, does not contest and will not oppose any factual allegation contained in the Petition's Summary of Facts," and that it "concedes, does not contest, and will not oppose the legal violations asserted in the Petition as follows." ECF No. 105-5. The Statement indicated that the school district would not oppose Plaintiffs' allegations that J.W. was denied a FAPE; that CCSD engaged in inappropriate interventions with respect to J.W.; that CCSD failed to provide J.W. with a proper placement in the least restrictive environment; and that CCSD failed to provide staff with training and supervision in appropriate behavioral interventions, thereby allowing J.W. to be subjected to interventions inconsistent with his Individualized Educational Plan ("IEP"). In response to CCSD's Statement, on March 29, 2019, the Independent Hearing Officer ("IHO") ordered that "on or before April 3, 2019," Plaintiffs and CCSD were to submit "Stipulated Findings of Facts and Conclusions of Law." ECF No. 105-5 at 3. CCSD failed to comply, and the parties subsequently engaged in correspondence regarding what, exactly, CCSD was conceding.

On April 9 and 10, 2019, the parties appeared before the IHO at a hearing. There, the parties resolved the issue of the stipulations, entering specific stipulated facts on the record. The IHO later memorialized these stipulated facts in his decision and order, issued April 22, 2019. The stipulated facts agreed to by the parties are as follows:

1.  On July 18, 2016, Student [J.W.] was enrolled at CCSD with

eligibility for special education services based upon Autism Spectrum Disorder.

2. Respondent [CCSD] conducted an IEP on July 18, 2016. Present Levels of Performance were noted and included social/emotional deficits.

3. Student's July 18, 2016, IEP did not document any elopement behavior.

4. On July 18, 2016, Respondent completed Supplementary Aids and Services which included a home/school communication system . . . and the use of positive behavioral strategies.

5. Student's May 17, 2017, IEP documented that Student was observed spending " . . . a great deal of time crying and screaming."

6. Respondent failed to adequately train and supervise relevant personnel in the delivery of positive behavioral strategies during the 2016-2017 academic year.

7. During the 2016-2017 academic school year, Student was educated at a CCSD school. The school's principal had a duty to supervise staff associated with the education of Student.

8. During the 2016-2017 academic school year, Student was periodically deprived of water at school in violation of N.R.S. Chapter 388.

9. During the 2016-2017 academic school year, Student was periodically deprived of food at school in violation of N.R.S. Chapter 388.

10. During the 2016-2017 academic school year, Student's parents notified the CCSD Superintendent concerning issues with food and water.

11. The CCSD failed to take corrective action during the 2016-2017 academic year to address the concerns raised by Student's parents as to food and water.

12. During the 2017-2018 academic school year, Student was assigned to a new teacher of record ("TOR") [Carter].

13. During the 2017-2018 academic school year, the school's principal where Student attended school had a duty to supervise Student's TOR.

14. During the 2017-2018 academic school year, Student's school principal/[R]espondent failed to ensure proper training of relevant staff in Applied Behavioral Analysis, Positive Behavioral Strategies, Proper Restraint Training and Compliance with N.R.S. Chapter 388.

15. During the 2017-2018 academic school year, Student was a victim of repeated corporal punishment by his TOR including, but not limited to, being beaten across the ankles, lower legs and stomach region.

16. On May 2, 2018, Student's TOR beat Student with a wooden pointer stick with such force it caused the wooden stick to break in two.

8

After the pointer broke, Student's TOR was heard stating, "I have more of these."

17. On May 3, 2018, a full day after the beating, [R]espondent reported the beating to Student's parents. Student's principal signed an incomplete CCF 624 Form [entitled Notice of Use of Physical Restraint, Mechanical Restraint or Aversive Intervention] describing the event.

18. During the 2017-2018 academic school year, Student sustained injuries some of which were a result of corporal punishment, requiring examination by a CCSD school nurse. The April 30, 2018 injury was not reported to Student's parents. The May 2, 2018 injury to Student resulting from corporal punishment was not reported to Student's parents until the following day.

19. During the 2017-2018 academic school year, CCSD staff observed, but failed to report until the following day, the use of corporal punishment inflicted upon Student by Student's TOR.

20. During the 2017-2018 academic school year, Respondent had a duty to adequately train and supervise relevant CCSD teachers and staff.

21. During the 2017-2018 academic school year, Student engaged in acts of elopement that were not documented or reported to Student's parents.

22. Respondent is responsible to train all staff in completing the CCF 624 paperwork correctly and in compliance with N.R.S. 388.

23. On May 3, 2018, [R]espondent contacted CCSD Police to conduct an investigation. The broken pointer was not available for evidence due to the fact that the garbage was already placed in the dumpster the night before and picked up in the morning.

24. On May 3, 2018, CCSD Police discovered three (3) wooden pointer sticks in Students' TOR's room.

25. On May 3, 2018, a Child Protective Services investigator conducted an interview with a peer of Student's TOR who witnessed the abuse by Student's TOR. The witness said that Student's TOR would routinely hit Student with the pointer stick "when [Student] was mean," or when Student removed Student's shoes/socks.

26. On June 7, 2018, a Criminal Complaint against Student's TOR was issued pursuant to N.R.S. 200.508.1B for the May 2, 2018 beating of Student.

ECF No. 120-1 at 376-378.

Based in part on these stipulated facts, the IHO determined that J.W. was denied a FAPE and was entitled to compensatory education. The IHO ordered four hours of compensatory education for each staff member assigned to work with J.W. in the remainder of the 2018-2019 and 2019-2020 school years. Plaintiffs appealed the IHO's determination and requested additional

9

compensatory education. On appeal, the State Review Officer ("SRO") found in favor of Plaintiffs and awarded J.W. 720 hours of compensatory education.

At the heart of these motions for summary judgment is a dispute over what effect, if any, the above stipulated facts should have in this action. Plaintiffs argue that under the doctrine of judicial estoppel, this Court should prohibit CCSD from taking factual positions in this action that are contrary to the factual positions that CCSD previously stipulated to in the administrative proceeding. Plaintiffs contend that the stipulations are directly inconsistent with CCSD's current arguments, and that these inconsistencies work a substantial disadvantage and unfairness to Plaintiffs. Specifically, Plaintiffs argue that the stipulated facts contradict CCSD's current position that J.W. was not deprived of food and water during the 2016-2017 school year, that J.W. was not physically struck by Defendant Carter during the 2017-2018 school year, and that CCSD did not fail to properly supervise those teachers who were responsible for J.W.'s care. Plaintiffs argue that by stipulating to certain facts in the earlier proceeding, CCSD received an unfair advantage, because the stipulations allowed CCSD to avoid disclosing, effectively concealing, certain documents like the Sosa Report and Labourdette statement, and CCSD was able to avoid having to confront witnesses at the IDEA hearing. Plaintiffs contend that both the undisclosed documents and the testimony from potential witnesses would have exposed CCSD to greater liability in the prior hearing and could have allowed J.W.'s parents to seek more compensatory educational benefits (or litigation damages) for J.W. than what they ultimately sought.

Defendant CCSD argues that judicial estoppel is inappropriate here and opposes the use of the stipulated facts for any purpose in this matter. Defendant contends that the stipulated facts did not give CCSD an unfair advantage because Plaintiffs knew the stipulations were conditioned on their limited application to the IDEA proceedings. Defendant notes that the Statement of Concession of Issues explained that the concessions were "solely for the purpose of the Petition and resolving issues presented for the [IDEA] hearing resulting therefrom" – a condition that CCSD's counsel raised again at the April 9 hearing before the IHO. Further, Defendant argues that Plaintiffs cannot prove they were deprived of any discovery they would have otherwise been entitled to as a result of the stipulations. To the extent Plaintiffs did not have the Sosa Report or

other witness statements at their disposal during the IDEA process, Defendant argues the information contained within those documents were available to Plaintiffs through other means, such as through the police reports that were provided to J.W.'s parents. Defendant argues that Plaintiffs did not experience any prejudice, as they prevailed in the administrative appeal of the IHO's decision and presumably were satisfied with the ultimate remedy afforded.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion," the purpose of which is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Ah Quin v. Cnty. of Kauai DOT, 733 F.3d 267, 270 (9th Cir. 2013) (quoting New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). Courts may consider three factors in deciding whether to apply the doctrine of judicial estoppel: (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a court to accept its earlier position, such that "judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782-83 (9th Cir. 2001) (quoting New Hampshire v. Maine, 532 U.S. at 750-51). Judicial estoppel applies not only where inconsistent statements were made to a prior court, but also where those statements were made in an earlier administrative proceeding. See Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 604 (9th Cir. 1996) (collecting cases).

The Court finds that judicial estoppel is appropriate here. First, the stipulated facts are clearly inconsistent with several of the positions that Defendant CCSD now seeks to take in this case. Specifically, while Defendant previously stipulated that J.W. was deprived of food and water during the 2016-2017 school year and was a victim of repeated corporal punishment by Carter during the 2017-2018 school year, it now seeks to introduce evidence to refute these positions. Defendant also previously conceded that CCSD staff were aware of the deprivations and corporal punishment inflicted upon J.W. but failed to respond promptly or accordingly – a position that CCSD now rejects.

Second, Defendant was able to persuade administrative officers to accept its earlier position, as evinced by the IHO's incorporation of the stipulations into his April 22, 2019 order, which the SRO also relied upon on appeal. The conflict between the earlier stipulations and CCSD's current position before this Court thereby creates the appearance that either the IHO and SRO were misled, or that this Court is being misled.

Finally, the Court finds that Defendant would derive an unfair advantage if permitted to deviate from its earlier stated positions. The Court acknowledges that the parties appeared to agree that the stipulations would be cabined to the IDEA proceeding. The Court, however, credits Plaintiffs' argument that they only agreed to the stipulations because they did not know the full extent of the abuse, and indeed, that CCSD entered into the stipulations for the purpose of concealing the full extent of the abuse. The Court further finds that <u>CCSD failed to disclose either the Sosa Report or Labourdette statement at any point during the IDEA proceeding despite Plaintiffs' direct requests for such material and the IHO ordering that CCSD turn over all documents related to any incidents involving J.W.</u>[1] It also finds that Plaintiffs did not have access to such documents and that Defendant CCSD was aware of this. Both the Sosa Report and Labourdette statement contained specific details regarding J.W.'s abuse that went above and beyond what CCSD stipulated to at the hearing before the IHO. For instance, while CCSD stipulated that J.W. was periodically deprived of food and water and that Defendant Carter struck

---

[1] As noted earlier, this is not to say that Plaintiffs did not attempt to uncover these documents during the IDEA process. To the contrary, Plaintiffs made several requests for production of documentation related to J.W.'s treatment in the classroom. Plaintiffs' document requests included, *inter alia*: "any incidents whereby CCSD's employees were involved in J.W.'s discipline, aversive intervention, corporal punishment, abuse, humiliation, emotional or mental trauma, or behavioral intervention;" "any observations, notes, summations of behavioral intervention suggested or applied to [J.W.];" "any document or summation involving the minor child where he was the subject of any disciplinary action by any faculty member;" "witness statements and/or acts of omission regarding [J.W.] by CCSD staff;" and "teacher statements regarding discipline or behavioral intervention of [J.W.] by CCSD staff." ECF No. 122-3 at 2-3.

Plaintiffs filed a motion to compel in connection with these document requests, and the IHO ordered the production of these above-listed documents to the extent that they were contained within J.W.'s educational record and were personally identifiable to J.W. <u>CCSD nevertheless did not disclose the Sosa Report or Labourdette statement as ordered.</u>

J.W. with a pointer stick, CCSD <u>did not</u> admit that Carter used other aversive interventions on J.W. – such as forcing J.W. to sleep under her desk, restraining him and other students in the small, dark cabinet enclosure as punishment, screaming at him repeatedly, or allowing him to fall to the ground – as alleged in the Sosa Report and Labourdette statement. Moreover, and importantly, Plaintiffs also did not know that these abuses had been <u>witnessed and documented</u> by at least these two adults, and that <u>CCSD (and its employees) knew of these additional facts and witnesses and failed to disclose them to Plaintiffs</u>. Plaintiffs only learned of these additional alleged abuses and undisclosed reports after receiving these written statements in discovery in this action, after Judge Youchah granted Plaintiffs' motions to compel the "written statements of witnesses to the May 2, 2018 battery of J.W." ECF No. 24-7. Plaintiffs thus lacked complete knowledge about the extent of the potential abuses, the existence of eyewitnesses to the abuse and documentation of additional abuse at the time of the IDEA proceeding. These additional allegations were directly related to the inquiry before the IHO and were relevant to the Plaintiffs' ability to decide the nature and extent of compensatory educational benefits they might request from the school district. By stipulating to certain facts regarding J.W.'s abuse, while omitting and concealing evidence of other alleged instances of aversive intervention and abuse, CCSD was able to obtain a substantive advantage over Plaintiffs in the IDEA proceedings.

Further, due to Defendant's willingness to enter into the stipulated facts, the IHO ordered that the IDEA proceeding would be limited to taking evidence for the purposes of fashioning a remedy. Prior to CCSD issuing its Statement of Concession of Issues, Plaintiffs intended to call various witnesses to the April 2019 hearing before the IHO to prove that J.W. had been subjected to abuse and neglect. These witnesses included Defendant Carter and ERM Director Darren Puana, who had read the Sosa Report and who was involved in the administrative investigation into the allegations of abuse. Through these witnesses' testimony, Plaintiffs would have learned of the undisclosed eyewitnesses, their reports, and the additional allegations of abuse in the Sosa Report that CCSD had failed to disclose. Shortly after learning of Plaintiffs' intent to call these witnesses to the hearing, however, CCSD submitted its Statement of Concession of Issues. Due to the filing of CCSD's Statement, the IHO determined that the April 2019 hearings would only cover "what

if any remedy Petitioner is entitled to," and accordingly, on April 3, 2019, CCSD filed a Motion to Strike Witnesses and Exhibits, in which it opined that "since the District has conceded all of the issues in this case . . . there is no need to call any of the witnesses listed by Petitioners." ECF No. 122-19 at 3. In particular, Defendant asserted that Puana "has no relevance to any issue or any remedy in this case," and that to the extent Plaintiffs sought to call other witnesses like Nadine Torres-Sosa or Erin Labourdette, "the District has conceded all issues related to the [2017-2018] school year and their testimony is irrelevant." Id. at 4-5. CCSD's assertion was patently incorrect. These witnesses, especially Puana and Labourdette, would have provided significant and substantial additional information beyond the admissions that would have been relevant to the IHO's determination of the appropriate "remedy" for the misconduct. Not realizing the additional information that these witnesses could provide, Plaintiffs subsequently agreed to withdraw the subpoenas for Carter and Puana and did not call any other witnesses to the April hearings. Based on the timeline described above and Defendant's statements, the Court finds that CCSD gained a clear and deliberate unfair advantage in the IDEA proceedings by entering into the stipulated facts. The stipulations allowed Defendant to continue to conceal the existence of adult eyewitnesses to abuse and the Sosa Report and Labourdette statement despite their obvious relevance to the administrative proceedings and despite having been ordered to turn over such material. The stipulations also allowed Defendant to prevent through its filing of motions to strike certain witness from testifying before the IHO, knowing that such testimony would have revealed the undisclosed additional information of abuse. Consequently, Plaintiffs were undisputedly undermined in their ability to seek additional educational benefits through the IDEA process based upon the additional information of abuse, as it was improperly withheld from them.

Finally, the Court does not agree with Defendant that the information contained within the Sosa Report or Labourdette statement were substantially provided to Plaintiffs through other means. Defendant alleges that because the Sosa Report was disclosed to CCSD police, and Plaintiffs were in communication with the police regarding the investigation into Carter, Plaintiffs would have necessarily had access to the Sosa statement. There is no indication in the record, however, that Plaintiffs ever received a copy of the Sosa Report or Labourdette statement from the

police, or that any disclosures from CCSD police would have included the specific allegations that J.W. was forced under Carter's desk, that Carter kept J.W. in the cabinet enclosure, that Carter allowed J.W. to fall, or that Carter repeatedly shouted at J.W. Defense counsel even conceded at the Court's March 15 hearing that she could not affirm that the police ever told Plaintiffs about the Sosa statement. Simply put, there is no identifiable or non-speculative evidence in the record to rebut Plaintiffs' position that CCSD withheld the relevant contents of the Sosa Report and Labourdette statement from Plaintiffs until April 2020.

Furthermore, Defendant's ongoing and vigorous litigation efforts in the IDEA proceeding and in this case to resist the production of these reports is clearly inconsistent with the notion that CCSD believed that such information was already known to Plaintiffs. It would be illogical for Defendant to file motions to strike and require the filing of a motion to compel regarding these witnesses and their reports if it believed that such information had already been disclosed to Plaintiffs.

Because the Court finds that all three factors militate in favor of judicial estoppel in this case, the Court precludes Defendant from taking a position contrary to the stipulated facts set out above.

### b. Plaintiffs' Partial Motion for Summary Judgment against Defendant CCSD (ECF No. 105)

Plaintiffs seek partial summary judgment as to Defendant CCSD for state law claims of assault and battery, intentional infliction of emotional distress, negligence, and negligent supervision, as well as for their claims brought under the ADA and RA. The Court addresses each claim in turn.

#### i. Assault and Battery

Plaintiffs first move for summary judgment in their favor on their assault and battery claims. Plaintiffs allege that CCSD is liable for Defendant Carter's acts of assault and battery through the doctrine of respondeat superior.

1
2
3
4
5
6
7
8
9

To establish an assault claim, a plaintiff must show that the actor (1) intended to cause harmful or offensive physical contact, and (2) the victim was put in apprehension of such contact. Burns v. Mayer, 175 F. Supp. 2d 1259, 1269 (D. Nev. Nov. 30, 2001) (citing Restatement (Second) of Torts, § 21 (1965)). To establish a battery claim, a plaintiff must show that the actor (1) intended to cause harmful or offensive contact, and (2) that such contact did occur. Id. Through respondeat superior, CCSD may be liable for the assault and battery committed by an employee, if the employee was under the control of CCSD, and the tortious act was committed within the scope of employment. Molino v. Asher, 618 P.2 878, 879 (Nev. 1980) (citing Nat'l Convenience Stores v. Fantauzzi, 584 P.2d 689, 691-92 (Nev. 1978)).

10
11
12
13
14
15
16
17

Plaintiffs argue the stipulated facts conclusively establish that Carter – and CCSD, by extension – committed assault and battery against J.W. when Carter subjected J.W. to "repeated corporal punishment" by beating him "across the ankles, lower legs, and stomach region," causing the wooden pointer stick to break in two. Plaintiffs add that Carter herself testified that she made contact with the pointer stick on J.W.'s body at least five times. Further, Plaintiffs argue that the deposition testimony from Carter and Labourdette establishes that Carter committed assault and battery when she restrained J.W. to the cabinet enclosure, when she forced J.W. to sit under her desk, and when she allowed him to fall to the ground.

18
19
20
21
22
23
24
25
26
27
28

Defendant argues that there is sufficient evidence in the record from which a reasonable jury could find that Carter did not commit assault or battery. For instance, Andrea Racowicz, an aide assigned to J.W.'s classroom during the 2017-2018 school year, testified that she never saw Carter use corporal punishment on a student. Further, even if Carter did touch J.W. with a pointer stick, Defendant argues that issues of material fact exist as to whether Carter intended for the contact to cause harm. Because the pointer stick was one foot long, thin, and had a small rubber hand on the end, Defendant contends that reasonable jurors could find that the stick did not break due to the force Carter used. Defendant notes that Carter has denied threatening or hitting J.W. with the stick, and that she testified only to tapping J.W.'s feet to prompt him to put his shoes on. Defendants also argue that a reasonable jury could conclude that Carter never intended to cause J.W. to apprehend a harmful or offensive contact, as Carter's testimony was that she only "tapped"

16

J.W. Further, Carter testified that she used the cabinet enclosure to give children a separate space in which they could calm down, and thus a genuine issue of material fact exists as to whether her disciplinary approach constituted assault. Finally, Defendant argues that Carter's testimony establishes that J.W. went under Carter's desk because he enjoyed napping there, and thus a genuine issue exists as to whether Carter assaulted J.W. by placing him under her desk.

The Court finds that based on the stipulated facts and undisputed evidence, no reasonable jury could find that Carter did not commit an assault or battery of J.W. The Court finds that no genuine issue of fact exists with respect to whether Carter intended to make harmful or offensive contact with J.W., whether J.W. was put in apprehension of such contact, and whether such contact occurred. The stipulated facts state conclusively that during the 2017-2018 academic school year, J.W. "was a victim of repeated corporal punishment" by Carter, "including, but not limited to, being beaten across the ankles, lower legs and stomach region." The stipulations further state that "on May 2, 2018, [Carter] beat [J.W.] with a wooden pointer stick with such force it caused the wooden stick to break in two," that Carter was overheard stating, "I have more of these," and that three wooden pointer sticks were found in Carter's classroom the next day. Moreover, the parties do not dispute that when J.W. was examined by the school nurse on May 3, 2018, the nurse found bruises on his ankles consistent with where he was reported to have been hit. While CCSD now seeks to argue that Carter never beat J.W., pointing to Carter's deposition testimony for support, CCSD is prohibited from taking that position, as stated in the Court's judicial estoppel analysis above. Given that CCSD may not argue a contrary position to that which was stipulated, no reasonable jury could evaluate CCSD's admissions and the physical evidence in the record and conclude that J.W. was subjected to anything other than an assault and battery. Carter's statement, "I have more of these," as well as CCSD's own admission that Carter engaged in repeated "corporal punishment" and "beat" J.W. with force, establish that Carter intended to cause harmful physical contact with J.W., that J.W. was put in apprehension of such contact, and that the contact did occur. Further, there is no dispute that Carter engaged in this conduct while working as an employee of CCSD, and during the scope and course of her employment as a CCSD teacher.

/ / /

17

As such, the Court finds that CCSD is vicariously liable for assault and battery, and accordingly grants summary judgment in favor of Plaintiffs on these state law claims. This claim shall proceed to trial solely on the issue of damages.

### ii.   Intentional Infliction of Emotional Distress

Plaintiffs also move for summary judgment against CCSD, via respondeat superior, for their claim of intentional infliction of emotional distress ("IIED").

To establish the tort of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct committed with either the intention of, or reckless disregard for, causing emotional distress; (2) that the plaintiff suffered severe or extreme emotional distress; and (3) actual or proximate causation. Star v. Rabello, 625 P.2d 90, 91-92 (Nev. 1981). Extreme and outrageous conduct "is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community," understanding that "persons must necessarily be expected and required to be hardened . . . to occasional acts that are definitely inconsiderate and unkind." Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998) (internal quotations omitted).

Plaintiffs argue that by beating J.W. with a pointer stick, enclosing him with a cabinet enclosure, allowing him to fall to the ground, and forcing him to sleep under her desk, Carter and Labourdette acted – at a minimum – with reckless disregard for causing J.W. emotional distress. Plaintiffs argue J.W.'s extreme emotional distress is well documented by the expert testimony of Dr. Huckabee, a pediatric neuropsychologist who testified that the alleged abuse caused J.W. to suffer from a sleep disorder and an eating disorder, and that J.W.'s toileting and verbal abilities declined after being placed in Carter's class.

Defendant responds that there is no evidence that the "time-out" area created by the cabinet enclosure was extreme or outrageous, and that Carter continues to dispute that her treatment of J.W. was intentional or abusive. Thus, Defendant argues, there is a genuine issue as to whether Carter or Labourdette acted with the intention of (or with reckless disregard for) J.W.'s emotional distress. Further, Defendant argues that there is evidence to refute Plaintiffs' position that J.W. suffered severe emotional distress as a result of alleged classroom abuse. For instance, there is no

evidence in the record that J.W.'s parents at any point sought treatment for J.W. related to the May 2, 2018 incident, and the first time a professional evaluated J.W. for trauma was at the inception of this lawsuit. Further, Defendant notes that CCSD's rebuttal expert, Dr. Lakes, disagreed with Dr. Huckabee's evaluation that J.W.'s poor growth trajectory was the direct cause of his alleged mistreatment at school, thereby creating a fact question for the jury.

The Court finds that genuine issues of material fact exist such that summary judgment is not warranted on Plaintiffs' claim for IIED. While the Court acknowledges the Plaintiffs' "common sense" approach to its argument that the stipulated facts must have given rise severe emotional distress by J.W., the Court finds that the presentation of conflicting expert evidence precludes summary judgment on this claim. While Plaintiffs have come forward with substantial evidence of emotional distress from their expert, Dr. Huckabee, Defendant has presented the contrary expert testimony of Dr. Lakes. A jury could discredit Dr. Huckabee's report in favor of CCSD's rebuttal expert, Dr. Lakes. See C.V. v. City of Anaheim, 823 F.3d 1252, 1256 (9th Cir. 2016) (stating that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are "quintessential jury question[s]").

The Court accordingly denies summary judgment on Plaintiffs' claim for IIED.

### iii.   Negligence

The Court next turns to Plaintiffs' claim for negligence. Plaintiffs allege both direct negligence by CCSD, as well as the vicarious liability of CCSD through Carter's negligence.

Plaintiffs argue the stipulated facts conclusively establish that Defendant is liable for negligence. Plaintiffs note that the testimony of Principal Schumm establishes that the use of corporal punishment, mechanical restraints, and the withholding of food and water are prohibited under CCSD policy. Plaintiffs argue that Defendant cannot dispute that CCSD violated its own policy – as well as its duties to J.W. – when it repeatedly deprived J.W. of food and water during the 2016-2017 school year. Further, Plaintiffs argue there is ample record evidence to support the fact that Carter regularly used inappropriate interventions on J.W. in violation of her duty to him, including by beating him with a pointer stick and placing him in mechanical restraints.

Defendant does not dispute that CCSD owed J.W. a duty of care. Instead, Defendant argues that whether a breach of that duty occurred presents a genuine issue of material fact. Defendant first contends there is no direct evidence that J.W. was ever deprived of food or water at school, and that the only evidence to support that claim is Plaintiffs' observation that J.W. appeared hungry and thirsty upon returning home from school. Second, Defendant alleges there is evidence to rebut Plaintiffs' assertion that Carter subjected J.W. to corporal punishment and other aversive interventions, as Carter and other classroom aides denied these events. Defendant further argues there is evidence to dispute both causation and damages. Defendant points to the rebuttal expert report of Dr. Lakes, who opined that J.W. does not have any problems with food resulting from any alleged deprivations of food or water in the 2016-2017 school year.

To prevail on a negligence claim, a plaintiff must establish (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages. Sanchez v. Wal-Mart Stores, Inc., 221 P.3d 1276, 1280 (Nev. 2009). In Nevada, causation has two components – actual cause and proximate cause. Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc., 101 P.3d 792, 797 (Nev. 2004) (quoting Dow Chem. Co. v. Mahlum, 970 P.2d 98, 107 (Nev. 1998)). In Nevada, negligence *per se* exists when a statutory violation results in an injury to a person who is a member of the class of persons the statute was designed to protect and the injury suffered was the type the statute was designed to protect against. Koepke v. Gregory, No. 3:04-cv-0090-LRH-RAM, 2007 U.S. Dist. LEXIS 115171, at *37 (D. Nev. Aug. 14, 2007) (citing Atkinson v. MGM Grand Hotel, Inc., 98 P.3d 678, 680 (Nev. 2004)). Whether a plaintiff belongs to the class of persons that a statute is designed to protect is a question of law for the court to decide. Id. (citing Vega v. E. Courtyard Assocs., 24 P.3d 219, 222 (Nev. 2001)). With limited exceptions, N.R.S. § 392.4633 prohibits corporal punishment, defined as the "intentional infliction of physical pain or the physical restraint of a pupil for disciplinary purposes." Physical force or restraint may only be used against a student to (1) quell a disturbance that threatens physical injury; (2) to obtain possession of a weapon within the pupil's control; (3) for self-defense; or (4) to escort a disruptive pupil who refuses to go quietly with the proper authorities. N.R.S. § 392.4633.

The Court finds that CCSD is liable for negligence *per se*, and that on the record evidence based upon the stipulated facts, no reasonable juror could find otherwise. The plain language of N.R.S. § 392.4633 statute indicates that it was intended to protect students, like J.W., from corporal punishment by teachers and school officials. See Koepke, 2007 U.S. Dist. LEXIS at *38. The stipulated facts – which CCSD is bound to – conclusively state that J.W. was subjected to corporal punishment during the 2017-2018 school year. Furthermore, Defendant does not and cannot argue that Carter used corporal punishment under one of the enumerated exceptions of N.R.S. § 392.4633. As such, CCSD is *per se* liable for negligence.

Summary judgment will accordingly be granted on this claim. It, however, will proceed to trial solely on the issue of damages.

### iv.   *Negligent Supervision*

Plaintiffs also seek summary judgment on their negligent supervision claim.

To establish negligent supervision, a plaintiff must prove (1) defendant owed a duty of care to the plaintiff; (2) defendant breached that duty by improperly supervising an employee even though defendant knew, or should have known, of the employee's dangerous propensities; (3) the breach was the cause of plaintiff's injuries; and (4) damages. Peterson v. Miranda, No. 2:11-cv-01919-LRH-PAL, 57 F. Supp. 3d, 1271, 1280 (D. Nev. Sept. 29, 2014) (citing Hall v. SSF, Inc., 930 P.2d 94, 99 (Nev. 1996)). Negligent supervision claims "are based upon the premise that an employer should be liable when it places an employee, who it knows or should have known behaves wrongfully, in a position in which the employee can harm someone else." Id. (quotations omitted). Importantly, an employee's wrongful behavior "does not in and of itself give rise to a claim for negligent . . . supervision." Colquhoun v. BHC Montevista Hosp., Inc., No. 2:10-cv-0144-RLH-PAL, 2010 U.S. Dist. LEXIS 57066, at *10 (D. Nev. June 9, 2010) (citing Burnett v. C.B.A. Sec. Serv., 820 P.2d 750 (Nev. 1991)).

Plaintiffs argue the stipulations establish their claim for negligent supervision. First, they argue CCSD stipulated that J.W. was injured when he was deprived of food and water in the 2016-2017 school year and subjected to various aversive interventions, including corporal punishment, in the 2017-2018 school year. Second, they argue CCSD conceded that it had a duty

to supervise staff associated with the education of J.W., including Carter. Third, they argue CCSD breached its supervisory duties by "fail[ing] to take corrective action during the 2016-2017 academic year to address the concerns . . . regarding deprivation of food and water," "fail[ing] to adequately train and supervise relevant personnel in the delivery of positive behavioral strategies during the 2016-2017 academic year," and "fail[ing] to ensure proper training of relevant staff in Applied Behavioral Analysis, Positive Behavioral Strategies, Proper Restraint Training, and Compliance with N.R.S. Chapter 388." Plaintiffs add that CCSD supervisory staff, such as Principal Schumm, knew or should have known of the various aversive techniques that Carter used. For instance, they argue that Sosa reported seeing mechanical restraint used on three different children during the four days she worked in Carter's classroom, and that Carter testified she made no effort to hide the cabinet enclosure – thus, Plaintiffs argue, CCSD had or should have had notice of these aversive interventions.

Defendant argues that even if CCSD were bound by these prior stipulations, there are genuine issues of fact pertaining to causation which preclude summary judgment. Even if CCSD supervisory staff failed to properly supervise Carter and other teachers charged with J.W.'s care between 2016-2018, Defendant argues, there is no evidence in the record that CCSD knew of any improper conduct by J.W.'s teachers or that CCSD's failure to act caused J.W. injury.

First, the Court finds that the stipulated facts establish that between 2016 and 2018, J.W. was injured while in the care of CCSD, and that CCSD breached a duty of care to J.W. CCSD stipulated that it owed J.W. a duty to supervise staff associated with his education in the 2016-2017 and 2017-2018 school years. CCSD further stipulated that it failed to properly supervise or train "relevant staff in Applied Behavioral Analysis, Positive Behavioral Strategies, Proper Restraint Training and Compliance with N.R.S. Chapter 388" in the 2017-2018 school year, and that it failed to "take corrective action during the 2016-2017 academic year" to address the allegations that J.W. was being deprived of food and water – thus constituting breach of CCSD's duty to properly supervise staff who cared for J.W. Further, the stipulations clearly establish that J.W. was injured, most notably through the deprivations of food and water in 2016-2017 and the use of corporal punishment in 2017-2018.

The Court finds, however, that there are genuine issues of material fact regarding causation best left for a factfinder. CCSD's stipulations do not establish that the school district's breach of its duty to properly supervise its staff caused J.W.'s injury. The stipulations do not concede that any supervisory staff member within CCSD knew that J.W. was subjected to corporal punishment or aversive interventions in the 2017-2018 school year, nor do they concede that proper training of relevant staff would have prevented the corporal punishment or aversive interventions from occurring. While the stipulations do acknowledge that the CCSD Superintendent was notified concerning issues with food and water in the 2016-2017 school year, they do not concede that the failure to take corrective action regarding the food and water deprivation was the actual or proximate cause of J.W.'s injury. To the contrary, there is other evidence in the record – including from the deposition testimony of Principal Schumm and J.W.'s father – that Principal Schumm attempted to address the concerns regarding food and water, even if these attempts did not ultimately constitute "corrective action." The Court is mindful that with regard to state law negligence and negligent supervision claims, the element of causation "usually present[s] questions of fact for the jury." Plank v. Las Vegas Metro. Polic Dep't, No. 2:12-cv-2205-JCM-PAL, 2016 U.S. Dist. LEXIS 32438, at *28 (D. Nev. Mar. 14, 2016) (citing Harrington v. Syufy Enters., 931 P.2d 1378, 1380 (Nev. 1997)). It will be for a jury to determine whether CCSD's failure to properly supervise its staff was the actual cause of J.W.'s injury.

The Court accordingly denies summary judgment on Plaintiffs' negligent supervision claim on the element of causation, but the Court's findings here, based upon the stipulated facts as to the other elements of this claim, shall binding on CCSD at the trial.

*v.   Americans with Disabilities Act and Rehabilitation Act*

Finally, the Court addresses Plaintiffs' claims under the ADA and RA.

The ADA and RA both prohibit discrimination on the basis of disability, but where the ADA applies only to public entities, the RA prohibits discrimination in all federally funded programs. Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity,

23

or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II was modeled after Section 504 of the RA, which provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a); Weinreich v. Los Angeles Cnty. Metro. Transp. Auth., 114 F.3d 976 (9th Cir. 1997).

To prevail on a claim under Title II of the ADA and Section 504 of the RA, a plaintiff must show that (1) he or she was a qualified individual with a disability; (2) he or she was denied a reasonable accommodation needed to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistance. A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1204 (9th Cir. 2016). Further, for both Title II and Section 504 purposes, the plaintiff must demonstrate that the exclusion or discrimination was by reason of the plaintiff's disability. Lovell, 303 F.3d at 1052. To prevail on a claim for compensatory damages under either statute, the plaintiff must show a *mens rea* of discriminatory intent on the part of the defendant. Id. Discriminatory intent may be shown by deliberate indifference, which involves two elements: first, a showing that defendants knew that a harm to a federally protected right was substantially likely, and second, a showing that defendants failed to act upon that likelihood. Id. (internal citation omitted). The plaintiff establishes the requisite knowledge or notice "when [he] shows that [he] alerted the public entity to [his] need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." Id. (internal quotations omitted). The second element of deliberate indifference – the "failure to act" prong – is established when a plaintiff shows that the failure to act was "a result of conduct that is more than negligent, and involves an element of deliberateness." Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).

There is no dispute that J.W., an autistic student, is a qualified individual with a disability. Nor is there any dispute that CCSD is a public entity receiving federal financial assistance. What the parties dispute is whether J.W. was denied a reasonable accommodation, and whether there is

sufficient evidence in the record to establish the *mens rea* of intentional discrimination. Plaintiffs argue that the stipulations from the IDEA proceeding clearly establish a denial of meaningful access to CCSD's educational programs and services. They argue that CCSD's concessions that J.W. was denied of food and water and beaten by Defendant Carter conclusively prove that J.W. was denied reasonable accommodations under the ADA and the RA. Plaintiffs further argue that CCSD acted with willful indifference to J.W.'s rights, as demonstrated by their failure to address J.W.'s parents' concerns regarding the food and water deprivations, as well as by their failure to discipline Defendant Carter. Defendant counters that Plaintiffs lack evidence to prove that J.W. was systemically denied equal access to an educational program or activity. Defendant further argues that even if the Court were to accept its previous concessions of corporal punishment and food and water deprivation as true, there is still insufficient evidence that CCSD acted with the *mens rea* of intentional discrimination. Defendant notes that the stipulations do not include any admission by CCSD of deliberate indifference, discrimination, or denial of a specific accommodation based on disability. To the contrary, Defendant argues, the evidence indicates that upon learning of Carter's alleged abuse, CCSD took a swift, coordinated response to remove her from the classroom, thus undermining any claim of deliberate indifference.

The Court finds that genuine issues of material fact exist regarding whether CCSD acted with the requisite *mens rea* of intentional discrimination. CCSD is prohibited from taking the position that J.W. was not deprived of food and water or subjected to corporal punishment between 2016 and 2018. However, the Court finds that there are genuine issues of disputed fact as to whether these abuses occurred due to CCSD's deliberate indifference. While CCSD conceded that J.W. was deprived of food and water during the 2016-2017 school year and that it failed to correct the deprivations, Plaintiffs have not provided evidence that the conduct was deliberate, and not merely negligent. See Duvall, 260 F.3d at 1138. Indeed, there is some evidence in the record that Principal Schumm spoke with J.W.'s teacher regarding the water deprivations and also told J.W.'s father that she would address his concerns. While these efforts may not have ultimately been fruitful or have resulted in true corrective action, the evidence in the record at least suggests that a

genuine issue of fact exists regarding whether the failure to mitigate the food and water deprivations constituted deliberate indifference.

Similarly, with respect to the corporal punishment inflicted on J.W., the Court finds that questions of fact exist as to whether CCSD acted with the requisite *mens rea*. The parties have presented conflicting accounts of CCSD's response to the allegations of Carter's abuse – while Plaintiffs argue that CCSD "failed to report allegations of J.W.'s abuse in a timely manner," constituting deliberate indifference, they do not point to specific evidence in the record that would support such a broad claim. Further, to the extent that Plaintiffs argue deliberate indifference is established by CCSD's failure to appropriately discipline Carter and Labourdette after learning of the Sosa Report, the Court finds that conflicting evidence suggests that Defendant did act promptly. CCSD removed Carter from the classroom on May 3, the day after receiving the Sosa Report. Carter then resigned shortly thereafter. CCSD also kept Labourdette out of the classroom until the police had completed their investigation and found no evidence of Labourdette having engaged in child abuse. The Court thus finds that it is appropriate for a factfinder to weigh the evidence to determine whether CCSD acted with deliberate indifference to the corporal punishment inflicted upon J.W.

The Court accordingly denies summary judgment on Plaintiffs' claims under the ADA and the RA.

      c.   <u>Plaintiffs' Partial Motion for Summary Judgment against Defendant Carter (ECF No. 77)</u>

Plaintiffs seek summary judgment as to Defendant Carter for the state law claims of assault and battery, negligence, and intentional infliction of emotional distress.

The Court first notes that its findings on judicial estoppel do not apply to Defendant Carter, as she was not a party to the IDEA hearing. At the Court's March 15, 2022 hearing, the parties acknowledged that it would violate Defendant Carter's due process rights to prevent her from taking factual positions contrary to those to which CCSD stipulated in the IDEA process, when she was never a party to those administrative proceedings. The Court agrees. As such, the Court's above findings regarding judicial estoppel will not apply to Defendant Carter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*i.  Assault and Battery*

Plaintiffs first move for summary judgment on their assault and battery claims against Carter. Plaintiffs contend that the Sosa Report reveals that Carter yelled in J.W.'s face, yanked J.W. under her desk and forced him to stay there, deliberately allowed J.W. to fall to the ground, and beat him with a pointer stick. These are actions they argue establish that Carter intended to cause harmful contact with J.W., that Carter put J.W. in imminent fear of such contact, and that such harmful contact did occur. Plaintiffs argue the undisputed evidence thus reveals that Carter committed assault and battery. Defendant Carter argues there is no evidence she attempted to harm J.W., and that there is at best disputed evidence as to whether J.W. was actually harmed, precluding summary judgment on Plaintiffs' assault claim.

The Court finds that genuine issues of material fact exist as to whether Carter committed assault and battery.[2] Plaintiffs' evidence and Defendant's evidence paint two different pictures of the type of contact Carter made with J.W. Throughout her deposition testimony, Carter consistently denied the allegations contained within the Sosa Report. When asked whether she yelled in students' faces, she explicitly stated: "I do not yell in students' faces, no." ECF No. 77-11 at 142:20. When asked whether she ever yanked J.W. under her desk and forced him to stay there, Carter explained that she occasionally put J.W. under her desk "where he liked to lay down," but that she never yanked him. Id. at 146:14-17. She explained that J.W. "liked it and was peaceful under there and could take a nap under there," id. at 152:8-10, that he appeared "comforted, from [her] perspective," id. at 153:8, and that she believed J.W. liked to be under her desk because it resembled the bottom bunk of his bed at home, id. at 155:22-25. When asked whether she ever deliberately allowed J.W. to fall to the ground, Carter responded as follows: "I let go of his hand, not so that he would fall to the ground. If he was pulling because he didn't want me to hold his hand . . . I will let him go, because I'm not going to force him to hold my hand." Id. at 163:18-21. Finally, when asked about the events of May 2, 2018, Carter admitted that she used the pointer stick to make contact with the bottoms of J.W.'s feet, but she denied ever beating J.W. with the

---

[2] The Court incorporates by reference the legal standard for assault and battery as stated in the preceding analysis.

pointer stick. Carter characterized the contact as a "tap," and explained that she used a "physical prompt" to encourage J.W. to put his shoes on. ECF No. 77-11 at 62:8-17; 108:22-109:1. Based on Carter's testimony, the Court finds that a genuine dispute of material fact exists as to whether Carter intended to make harmful or offensive contact with J.W. See Burns, 175 F. Supp. 2d at 1269.

As such, the Court denies summary judgment with respect to Plaintiffs' assault and battery claims against Carter.

### ii.  Negligence

The Court next addresses Plaintiffs' negligence claim against Carter. Plaintiffs argue that Carter breached her duty of care to J.W. by beating him with a pointer stick, forcing him under her desk, letting go of J.W.'s hand so that he fell to the ground, and placing him between cabinets as punishment. As with their assault and battery claims, Plaintiffs rely primarily upon the allegations within the Sosa Report. Plaintiffs add that Carter admitted in her own deposition to placing students in an enclosure created by two cabinets in the classroom when they were being disruptive. Defendant denies the Sosa allegations and argues that whether her conduct constituted negligence involves questions of breach, causation, and damages that are best left to a factfinder.

For the same reasons as stated in the above assault and battery analysis, the Court finds that genuine disputes of material fact exist regarding whether Carter ever committed the acts alleged by Plaintiffs (and as set forth in the Sosa report).[3] Carter testified that she never beat J.W., forced him under her desk, or allowed him to fall to the ground – thus, it is for a factfinder to weigh Plaintiffs' evidence against Carter's testimony to determine whether the alleged abuse occurred for the purposes of establishing a breach of Carter's duty to J.W. The same is true regarding the allegations that Carter subjected J.W. to excessive punishment by keeping him in a cabinet enclosure. While Plaintiffs argue that Carter herself admitted to this and note that Principal Schumm submitted a "Notice of Use of Physical Restraint" in connection with these allegations, the Court finds that a reasonable jury could conclude otherwise. When asked about the cabinet

---

[3] The Court incorporates by reference its earlier recitation of the legal standard for negligence.

enclosure, Carter explained that her students would sit in a chair situated between two cabinets for a brief period of time – "no more than a couple of minutes" – as a "time-out." ECF No. 77-11 at 43-1-47:5. She explained that the cabinets were never used to restrain students, and that students could "get up and walk out if they wanted to." Id. at 44:22-25. The Court finds that a reasonable juror could conclude from Carter's testimony that her use of the cabinet enclosure did not constitute a mechanical restraint.

The Court accordingly denies summary judgment on Plaintiffs' negligence claim.

### iii.   Intentional Infliction of Emotional Distress

Finally, the Court addresses Plaintiffs' claim of IIED against Defendant Carter. On this claim, Plaintiffs reiterate many of the same arguments raised in its motion for summary judgment against CCSD. They contend that the evidence establishes that Carter beat J.W. with a stick, forced him to sleep under her desk, let go of his hand so that he would fall to the ground, and confined him behind two cabinets. They argue that such behavior, leveled against a non-verbal autistic child, is nothing short of extreme and outrageous conduct. As with the other claims against her, Defendant fundamentally disputes both the nature and fact of the alleged conduct.

For the reasons stated in the Court's earlier analysis, the Court finds that genuine issues of material fact exist regarding whether the underlying conduct occurred.[4] As such, the Court denies summary judgment on Plaintiffs' IIED claim against Carter.

### d.   Defendant CCSD's Motion for Summary Judgment (ECF No. 100)

Defendant CCSD cross-moves for summary judgment on Plaintiffs' sixth, seventh, eighth, and tenth claims for violations of J.W.'s substantive due process rights, equal protection rights, and rights under the ADA and the RA.

### i.   42 U.S.C. § 1983

Defendant CCSD moves for summary judgment on Plaintiffs' substantive due process and equal protection claims, brought under 42 U.S.C. § 1983.

To successfully bring a Section 1983 claim, a plaintiff must show (1) a violation of a constitutional right and (2) that the alleged violation was committed by a person acting under color

---

[4] The Court incorporates by reference its earlier recitation of the legal standard for claims of IIED.

1    of state law. West v. Atkins, 487 U.S. 42, 48 (1988). There is no respondeat superior liability under

2    42 U.S.C. § 1983. Bell v. Clackmas County, 341 F.3d 858, 867 n.3 (9th Cir. 2003). For a municipal

3    entity like CCSD to be held liable under § 1983, there must be a showing that it had a "deliberate

4    policy, custom, or practice that was the moving force behind the constitutional violation." Galen

5    v. County of Los Angeles, 477 F.3d 652, 667 (9th Cir, 2007).

6        A plaintiff may establish municipal liability either by identifying (1) an official policy; (2)

7    a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or

8    act by a final policymaker. Horton v. City of Santa Maria, 915 F.3d 592, 602-3 (9th Cir. 2019). To

9    prevail on a failure-to-train theory of municipal liability, a plaintiff must identify a "pattern of

10   similar constitutional violations by untrained employees," or prove that "the consequences of

11   failing to train are so patently obvious that a municipality could be liable . . . without proof of a

12   pre-existing pattern of violations." Connick v. Thompson, 563 U.S. 51, 62 (2011). Further, the

13   plaintiff must demonstrate that the failure to train amounted to deliberate indifference to the rights

14   of persons with whom the employee comes into contact. Long v. County of Los Angeles, 442 F.3d

15   1178, 1186 (9th Cir. 2006).

16                    1.   Substantive Due Process

17       Defendant first argues that summary judgment is appropriate as to Plaintiffs' substantive

18   due process claim because Plaintiffs cannot show that J.W. suffered constitutional injury.

19   Defendant argues that Plaintiffs merely speculate that J.W. was not getting enough food or water

20   at school. Defendant also contends that even if the Court were to accept that Carter inflicted

21   corporal punishment on J.W., not all physical interactions at school rise to the level of a

22   constitutional injury, and that there is no evidence that Carter's alleged abuse was so malicious,

23   egregious, or oppressive that it violated J.W.'s constitutional rights. Even if Plaintiffs could

24   establish that these constitutional injuries occurred, Defendant argues that Plaintiffs cannot impute

25   liability to the municipality, as Plaintiffs cannot show that CCSD had a policy or custom

26   amounting to deliberate indifference to J.W.'s rights. Finally, Defendant argues that Plaintiffs have

27   no evidence of a causal link between Plaintiff's harm and any "well-settled practice" or unofficial

28   policy of CCSD's that served as the "moving force" behind the constitutional violations.

1

2      Plaintiffs respond that there is ample evidence that J.W. suffered constitutional injury,

3   relying largely on the stipulated facts. Plaintiffs argue that CCSD's stipulations that J.W. was

4   subjected to corporal punishment and food and water deprivations are conclusive evidence of

5   constitutional injury. Plaintiffs also contend that these stipulations are supported by Dr.

6   Huckabee's findings that J.W. will likely suffer from lifelong psychological and physical harm

7   due to Carter's abuse. Further, Plaintiffs argue that deliberate indifference on the part of CCSD is

8   well established, as there is evidence that J.W. exhibited signs of abuse throughout the 2016-17

9   and 2017-2018 school years, that these signs were reported to Harmon staff, and that CCSD did

10  not promptly respond. Plaintiffs note that CCSD admitted to failing to train its employees and

11  failing to take corrective action to address J.W.'s suffering (specifically, the food and water

12  deprivations). Finally, Plaintiffs argue there is ample evidence to support a causal link between

13  CCSD's deliberate indifference and Plaintiff's harm. Plaintiffs argue that Carter's own deposition

14  testimony establishes that Carter's practices of enclosing students in confined spaces for discipline

15  and using the pointer stick to physically intimidate children were chronic, and therefore should

16  have been apparent to supervisory staff, especially given that J.W.'s parents had already put the

17  school on notice of abuse J.W. suffered in the previous school year. Plaintiffs argue that a rational

18  trier of fact could thus find that CCSD's failures to train and supervise was the moving force behind

19  Plaintiff's injuries.

20      To violate substantive due process, alleged conduct must "shock the conscience." Porter v.

21  Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008). In the context of use of force in schools, it is well

22  established that "excess force by a school official against a student violates the student's

23  constitutional rights." Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1180 (9th Cir.

24  2007). In considering whether a student's substantive due process rights have been violated

25  through the use of force, restraints, or other interventions in the classroom, courts consider the

26  need for the governmental action in question, the relationship between the need and the action, the

27  extent of harm inflicted, and whether the action was taken in good faith or for the purpose of

28  causing harm. Plumeau v. School Dist. # 40, 130 F.3d 432, 438 (9th Cir. 1997).

31

The Court finds that, based on the stipulated facts, J.W. was subjected to deprivations of food and water, repeated instances of corporal punishment which left bruises on his body, and mechanical restraints (placed under Carter's desk and between cabinets). CCSD has conceded that at least the corporal punishment and food and water deprivations occurred, and cannot now take a contrary position. The Court finds that subjecting a student to such wanton and repeated physical deprivations and punishment shocks the conscience and is sufficient to establish a violation of due process. See Ingraham v. Wright, 430 U.S. 651, 674 (1977) (stating that "where a school official acting under color of state law deliberately decides to punish a child for misconduct by restraining the child and inflicting appreciable physical pain," the student's due process rights are implicated).

The Court further finds, however, that genuine issues of material fact exist regarding whether CCSD is liable as a municipal entity due to its failure to train and supervise Carter and other relevant staff. CCSD conceded that it failed to properly train staff in proper behavioral interventions in the 2017-2018 school year, and that it failed to take proper corrective action to address the food and water deprivations in the 2016-2017 school year. There is also evidence in the record that may support a finding that these failures to train and supervise amounted to deliberate indifference. For instance, J.W.'s parents testified that they discussed with Principal Schumm their concern that J.W. would return home from school with food unopened and water unconsumed. J.W.'s mother also testified that she noticed bruising on J.W.'s body during the 2017-2018 school year, and reported these bruises to Carter and her aides. The Court further finds that a reasonable jury could find that if CCSD had investigated either the reports from the previous school year, or Ms. Wahrer's complaints about J.W.'s bruises in 2017-2018, they would have discovered Carter's abuses and prevented J.W.'s harm. A reasonable factfinder could also conclude that because Carter herself admitted to using the disciplinary practices on more than one occasion, those practices would have been reasonably discoverable through even a cursory examination or supervision by superiors, and that under the circumstances, the consequences of failing to train and supervise are "patently obvious." Connick v. Thompson, 563 U.S. 51, 62 (2011). Namely, a reasonable juror could find that by failing to train its teachers in proper positive behavioral strategies, restraint training, and other techniques, it would be "highly predictable" that

a teacher might subject a student to improper and excessive corporal punishment and other aversive techniques. In sum, a factfinder could conclude that a failure to train and supervise was the moving force behind the constitutional violations, and that reasonable training and interventions could have prevented J.W.'s abuse. These undisputed and disputed facts do not support a finding for Defendant CCSD on this claim.

The Court accordingly denies Defendant summary judgment on Plaintiffs' substantive due process claim.

### 2. Equal Protection

Defendant also argues that summary judgment is appropriate on Plaintiffs' equal protection claim. Defendant argues that Plaintiffs' equal protection claim cannot survive because there is no evidence in the record from which a jury could conclude that CCSD acted with deliberately discriminatory intent or motive. Plaintiffs counter that there is evidence that CCSD acted in an intentionally discriminatory manner. They point to recorded interviews of two peer students in J.W.'s class in 2017-2018 who are able to verbalize and are not autistic. In these interviews, the peer students stated that they saw Defendant Carter repeatedly strike J.W. with a pointer stick during, but that they did not see her treat non-disabled students in that manner. ECF No. 115. Plaintiffs also argue there is no evidence to suggest that any of the typical peers in J.W.'s class were ever mechanically confined (either in the cabinets or under Defendant Carter's desk), deprived of food or water, screamed at, or beaten with a pointer stick. Plaintiffs argue this is manifest evidence of discriminatory intent.

To survive summary judgment on a § 1983 equal protection claim, a plaintiff must provide evidence sufficient to prove that the defendant acted in a discriminatory manner and that the discrimination was intentional.  Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000). Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001). It implies that the decisionmaker "selected or reaffirmed a particular course of action at least in part because of, not merely in spite" of its adverse effects on the plaintiff. Id. Differential treatment among similarly situated individuals may give rise to an inference of discriminatory intent; under this "class of one"

theory, a plaintiff must prove that he was intentionally treated differently from others similarly situated, and that there was no rational basis for the difference in his treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Gerhart v. Lake County, Mont., 637 F.3d 1013, 1022 (9th Cir. 2011). The discriminatory treatment must be "intentional directed just at [the plaintiff], as opposed . . . to being an accident or a random act." N. Pacifica LLC v. City of Pacifica, 526 F.3d 478, 486 (9th Cir. 2008).

The Court finds that genuine issues of fact preclude summary judgment on Plaintiffs' equal protection claim. The Court agrees with Plaintiffs that the recorded peer interviews suggest that Carter only hit disabled students and did not hit similarly-situated, non-disabled students. J.W.'s verbal, non-autistic peers stated that Carter did not ever hit them with the stick, but that they saw Carter hit J.W. several times and that she "always broke" the pointer stick. ECF No. 115. The students testified that Carter "hit [J.W.] on the feet," thighs, and "tummy," causing pain to J.W., whenever J.W. would take his shoes off. Id. On the basis of this evidence, a reasonable jury could conclude that Carter's conduct was intentional, and not random, sufficient to establish discriminatory intent through the "class of one" theory. Further, Plaintiffs have adduced sufficient evidence that would impute municipal liability to CCSD. As stated in the Court's substantive due process analysis, there is evidence in the record to suggest that the consequences of CCSD's admitted failure to train staff in the appropriate behavioral interventions are patently obvious.

The Court accordingly denies summary judgment on this claim.

### ii. ADA and RA

Finally, the Court briefly addresses Defendant's summary judgment argument with respect to Plaintiffs' claims under the ADA and RA.

Defendant's arguments in support of dismissal of these claims are identical to those it raised in opposition to Plaintiffs' motion for summary judgment on these claims. Defendant fundamentally disputes that J.W. was systemically denied equal access to an educational program or activity, and argues that there is no evidence that CCSD acted with the mens rea of intentional discrimination.

The Court incorporates by reference its preceding analysis on these claims and finds there

34

is sufficient evidence in the record from which a reasonable jury could conclude that J.W. was denied benefits under the ADA and RA, and that CCSD acted with deliberate indifference. CCSD is bound to its stipulations that J.W. was denied food and water, and that he was the victim of corporal punishment. Triable questions of fact exist with respect to whether CCSD properly investigated J.W.'s parents' reports that J.W. was bruised in the 2017-2018 school year or that he was being deprived of food and water in the 2016-2017 school year. Triable questions also exist as to whether CCSD promptly and appropriately responded to the Sosa Report's allegations of abuse by Defendant Carter. For these reasons, the Court denies Defendant's motion for summary judgment with respect to these claims.

**VI.     CONCLUSION**

      **IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment as to Defendant CCSD (ECF No. 105) is GRANTED in part and DENIED in part. Summary judgment is granted in Plaintiffs' favor with respect to the claims for assault, battery, and negligence. Summary judgment is denied with respect to the claims for IIED, negligent supervision, and violations of the Americans with Disabilities Act and the Rehabilitation Act.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment as to Defendant Carter (ECF No. 77) is DENIED.

      **IT IS FURTHER ORDERED** that Defendant CCSD's Motion for Summary Judgment (ECF No. 100) is DENIED.

      **IT IS FURTHER ORDERED** that the parties shall submit a joint pretrial order by October 7, 2022.

      **DATED:** <u>September 19, 2022</u>.



      **RICHARD F. BOULWARE, II**
      **UNITED STATES DISTRICT JUDGE**